HOOD, Judge.
Eddie Rosenberger sues to recover damages for physical injuries sustained by him while competing in a rodeo. Defendants are: (1) Central Louisiana District Livestock Show, Inc. (Central); (2) Rapides Parish Police Jury (Police Jury); (3) Continental Insurance Company (Continental), insurer of Police Jury; (4) Louisiana Rodeo Association, Inc. (LRA); (5) Woodrow DeWitt (DeWitt); and (6) William Thomas Lewis (Lewis). Central filed a third party action against most of the other defendants to recover any amount it might be condemned to pay plaintiff. DeWitt and Lewis filed a third party action against Police Jury and LRA for the amounts they might be required to pay.
The trial court rendered judgment in favor of plaintiff against Central, DeWitt and Lewis, and it dismissed plaintiff’s suit as to the remaining defendants. Central, DeWitt and Lewis have appealed. Plaintiff has answered the appeal, demanding that the amount of the award be increased.
The principal issues presented are whether the defendants-appellants were negligent, and if so, whether plaintiff is barred from recovery by his own contributory negligence or assumption of the risk.
The accident occurred on February 20, 1970. Central, a non-profit corporation, was conducting its annual district livestock show for 4-H and F.F.A. club members in the Rapides Parish area, and in connection with that show it arranged for a rodeo to be held beginning on February 20 in the Rapides Parish Coliseum in Alexandria. It entered into an oral contract with De-Witt, under the terms of which the latter was to furnish the stock and produce the rodeo. Lewis was engaged by DeWitt to serve as Rodeo Boss, and several of De-Witt’s employees worked under Lewis’ supervision.
A large number of contestants desired to participate in the rodeo, and it was impossible for all of them to compete during the “regular show,” that is, the part of the rodeo which was conducted before paid spectators. It was arranged, therefore, as is *628 usually done under those circumstances, that the contestants who did not compete during the regular show would do so during the “slack” part of the rodeo, that is, during the period immediately after the regular show was over and after the spectators had left.
Plaintiff entered the bareback bronco riding contest. He was unable to compete during the regular show, but he did ride during the “slack” part of the rodeo, after the regular show had been completed, on February 20. At the time scheduled for him to participate, he mounted a horse in a bucking chute located in the northeast part of the oval shaped arena. When the chute was opened the bucking horse being ridden by plaintiff moved along the west side of and down to the south end of the arena. When the horse reached a point in the southeastern part of the arena, it attempted to go through a gate which happened to be partially open, and in doing so, it caused plaintiff’s left knee to strike the edge of the gate resulting in injuries which form the basis for this suit.
The partially opened gate through which plaintiff’s bucking horse attempted to run controlled the entrance to a “box,” or a relatively small enclosure for stock, located in the southeastern part of the arena. This “box” was used to confine calves and steers for the calf roping and the bull dogging or steer wrestling contests, and those animals were released into the arena from that box by opening the above mentioned gate. A similar box was located in the southwestern part of the arena, and it also was used for the calf roping and bull dogging contests. There was a “chute” between those two boxes leading to pens south of the coliseum. After a calf or steer had been used in an event, it was driven out of the arena through the above mentioned chute,
All parties agree that a bucking horse ordinarily will attempt to go through a partially opened gate, or any other opening, in an effort to get out of the arena or to dislodge the rider, and that it thus is dangerous for a gate leading into or from the arena to be left open or partially open while a contestant is riding a bucking bronco. Plaintiff would not have attempted to ride the bucking horse on that occasion if he had known or observed that the gate was partially open. Anyone familiar with rodeos who may have seen or known that the gate was open while the bucking bronco contest was in progress would have foreseen that an accident likely would occur if and when the bucking horse, still bearing its rider, got to that end of the arena.
The last event which was held in the south end of the arena before the above mentioned accident occurred was the “bull dogging” contest. That event took place during the “regular show,” and the two above mentioned “boxes” were used in conducting that part of the rodeo. After that event was completed the gate which plaintiff later struck was closed and “tied” shut with a rope bygone of DeWitt’s employees, L. D. Johnson, who was working in the production of the rodeo. The rope was tied w-ith a double knot, and there is no question but that it was properly and securely tied, and that the gate could not be opened unless someone actually untied the rope. After the bull dogging contests were completed all of DeWitt’s employees and most of the contestants moved to the north end of the arena for the “bull riding” contest, which was the last event of the “regular show.” The bulls used for those contests were released from boxes in the north end of the arena, and after each contest the bull so used was driven out of the arena through a chute in the north end of it.
The regular show ended after several contestants competed in the bull riding contest. Practically all of the spectators then left the arena, and the “slack” part of the rodeo began. The remaining bull riders were the first to compete during the slack period, and the practice was continued of releasing the bulls from boxes in the north part of the arena. After the bull *629 riding events were completed, the bareback bronco riding contests were resumed, and the bucking horses also were released from boxes in the north end of the arena. Plaintiff was the third or fourth contestant who rode a bucking horse during the slack part of the rodeo.
A period lasting from 30 minutes to one hour elapsed between the time the bull dogging contests were completed and the time the accident occurred. The gate which figured in this accident thus was tied shut from 30 minutes to an hour before plaintiff undertook to ride a bucking horse. During that time none of the rodeo employees had returned to the south end of the coliseum, and none of them observed that the rope on the gate had been untied or that the gate had been partially opened before plaintiff was injured. The arena was 240 feet long, from north to south, and it is improbable that a person in the north end of the arena could have detected from that point that the gate here in question was partially open, even if he had made an effort to do so. Plaintiff testified that he did not notice that the gate was partially open until his horse reached a point three or four feet from it.
One of the “pick-up” men who worked during the rodeo, and who was present when plaintiff was injured, testified that he worked in the arena during all of the bull riding events, including those which took place in the slack period, and that he did not see the gate partially open during any of those contests. He stated that he would have noticed if a gate had been open during any of those events. He also worked in the arena during all of the bucking bronco contests which took place in the slack period immediately after the bull riding events were over, and he did not notice the gate being open during any of those events until plaintiff got hurt. We think his uncontradicted testimony establishes that the gate remained closed during all of the bull riding events and at least until the bareback riding contests began in the slack period. We have already noted that plaintiff was the third or fourth contestant in the bareback riding events during the slack part of the rodeo.
The evidence shows that contestants and spectators sometimes open gates in the arena to go through them, but that each such person who uses a gate is expected to close and re-tie it after he goes through it. Since the gate involved in this accident had been securely tied, it is apparent that the only way it could have come open was for someone to have untied the rope which secured it and then failed to properly close the gate again. The evidence also establishes that the gate was not opened until sometime after the bull riding contests had ended and the bucking bronco riding events had started.
The trial judge held that the defendants-appellants were negligent in having failed to institute and carry out a policy or method of checking to see that the gates were closed before each contest, and that their negligence in that respect renders them liable to plaintiff for the damages he sustained. He concluded, in effect, that since defendants did not follow a policy of inspecting the arena before each contest, it is immaterial whether one of defendants’ employees opened the gate or how long it had been opened before the accident occurred. In his reasons for judgment the trial judge stated:
“Therefore, the Court concludes that even though plaintiff could not prove how long the gate had actually been open, the fact that defendant had no policy or method for checking the gates was negligence in itself and as a result thereof, defendants are responsible for the injury to plaintiff. Furthermore, defen-ants had two employees (pick up men) who stationed themselves in the arena, either of whom could have simply ridden a few feet to check each gate before this contest began, especially since defendants admitted that spectators sometimes used these gates in moving about the coliseum and left them open.”
*630 We think the trial judge erred in holding that defendants were negligent, and that he also erred in failing to find that plaintiff is barred from recovery because of his assumption of the risk.
DeWitt, as the producer of the rodeo, was the occupier of the coliseum, and plaintiff was an invitee when the accident occurred. The duty of the occupier of premises to an invitee is to exercise reasonable or ordinary care for his safety commensurate with the particular circumstances involved. The occupier, however, does not insure an invitee against the possibility of accident. The invitee assumes all normally observable or ordinary risks incidental to the use of the premises. The occupier is not liable for an injury to an invitee resulting from a danger which is observable, or which the invitee should reasonably have appreciated before exposing himself to it. Foggin v. General Casualty Insurance Co., 250 La. 347, 195 So.2d 636 (1967); Levert v. Travelers Indemnity Co., 140 So.2d 811 (La.App. 3 Cir. 1962); Granger v. United States Fidelity & Guaranty Co., 266 So.2d 526 (La.App. 3 Cir. 1972).
The premises in the instant suit were being used for conducting a rodeo. There were no defects in those premises which in any way contributed to the accident, and the arena clearly was adequate for that purpose. Plaintiff contends, however, that the occupiers of those premises, the producers of the rodeo, failed to exercise reasonable care for his safety by allowing a gate to remain partially open during the bareback riding contest. We agree that a partially opened gate constitutes a danger under those circumstances, and one issue presented is whether defendants-appellants exercised reasonable care in attempting to protect plaintiff from that danger.
The evidence shows that the gate had been securely fastened from 30 minutes to an hour before the accident occurred, and that it remained closed and fastened until shortly before plaintiff was injured. It is apparent that it was opened by someone only a few moments before the accident occurred. Plaintiff stated that “it is entirely possible” that the gate was opened by another contestant while his ride was “in progress.” He knew that it was the practice in rodeos to permit other contestants to enter and leave the arena while contests were being held, and he explained that they were allowed in the arena during the bareback riding contests “to assist with the rigging of the horses.” Plaintiff assumed “that anybody that is going to go through that gate is going to close, it” and that “it would be expected that somebody did pass through it, they would close it.”
Although the producers of the rodeo did not routinely inspect the arena immediately before each contest to determine that all gates were closed, the evidence shows that pick-up men were in the arena during those events, and they were in positions to determine whether gates were open or any other dangerous conditions existed. In this instance one of the two pick-up men, the only one who testified at the trial, determined and testified that the gate remained closed at least until the bareback riding contest began in the slack period, only a few minutes before plaintiff was injured. Two or three other contestants participated in the bareback riding event immediately before plaintiff did so, and the evidence shows that none of the horses used in those contests tried to go through the gate which was involved in this accident.
The evidence convinces us that the gate through which plaintiff’s horse attempted to enter was opened by a contestant, or by someone other than an employee of defendants, immediately before or while plaintiff was engaged in his bareback riding contest. We conclude that it was not opened by one of defendants’ employees because all such employees were at the other end of the arena. The opening of the gate thus cannot be attributed to any negligence on the part of defendants or their *631 agents. It is apparent that even if a formal inspection of the arena had been made routinely by defendants, before each contest took place, it would not have revealed an open gate. The failure to maintain routine inspection of the arena immediately before each contest, therefore, whether required by law or not, could not have been a proximate cause of this accident.
Our conclusion is that the defendants exercised the degree of care required of them by law, and that they are not liable to plaintiff for the damages which he sustained as a result of the above mentioned accident.
Although we base our decision on the ground that defendants are free from negligence, we think it is appropriate to observe that even if defendants had been negligent, plaintiff is barred from recovery because he assumed the risk of the type of accident which occurred.
A rodeo is a dangerous sport involving the risk of injury to both participants and spectators. We think that a person who voluntarily participates as a contestant in that sport, with full knowledge of the dangers involved, assumes the risk inherent in doing so. Gaspard v. Grain Dealers Mutual Insurance Co., 131 So.2d 831 (La.App. 3 Cir. 1961) ; Jones v. Alexandria Baseball Association, 50 So.2d 93 (La.App. 2 Cir. 1951).
Plaintiff concedes that he assumed the risk of injury when he voluntarily became a participant in the rodeo, but he contends that he assumed only those risks which he could see, and of which he was aware at the time he entered the contest. He takes the position that he could not and did not know that the gate was partially opened, ■ and that he thus did not assume that particular risk. He argues that it was the duty of the producers of the rodeo to see that the arena was reasonably safe, that he had a right to assume that a gate would not be left partially open, and that he thus did not assume the risk that defendants would be negligent in allowing that dangerous condition to exist.
The rodeo in which plaintiff was participating when he sustained an injury was sponsored by the LRA. Plaintiff was required to join that association before he could enter the rodeo, and he did so. The rules of the LRA provide that each participant by the act of his entry waives all claims against the stock contractor, LRA or rodeo committee for injuries he may sustain. Plaintiff concedes that he joined the LRA, but he stated that he did not sign any document absolving anyone from liability, and that the book which contained the rules of the association was not received by him until a week or two after the accident occurred. He also testified, however, that he had participated as a contestant in many rodeos, that he had belonged to the LRA on a prior occasion, that he “broadly knew the rules,” and that he was “fairly familiar with them.” He stated that “I am familiar, very much, with the rules of the events in which I participate.”
A number of witnesses who were experienced as contestants and as producers of rodeos testified that it is customary in all rodeos for the contestant to assume the risk of injury, including an injury resulting from the type accident which occurred in this instance.
In this case plaintiff was aware of the fact that contestants and others go through gates in the arena, and that it would constitute a danger if a gate were allowed to remain partially open. He knew that contestants usually close the gates after they use them, and that they assist in the conduct of the rodeo. He obviously assumed that they would do so in this rodeo. Considering all of the circumstances, we feel that he assumed the risk that a contestant or someone else would leave a gate open. He thus assumed the risk of the type of injury which occurred in this case.
Having concluded that defendants were not negligent, and that in any event plaintiff is barred from recovery because of his assumption of the risk, we must hold that the trial judge erred in rendering judgment in favor of plaintiff.
*632 For the reasons assigned, the judgment appealed from is reversed, and judgment is hereby rendered in favor of defendants, rejecting plaintiff’s demands, at plaintiff’s costs. The costs of this appeal are assessed to plaintiff-appellee.
Reversed.
DOMENGEAUX, J., dissents and assigns reasons.