312 So.2d 300 (1975)
Eddie ROSENBERGER
v.
CENTRAL LOUISIANA DISTRICT LIVESTOCK SHOW, INC., et al.
No. 55495.
Supreme Court of Louisiana.
April 24, 1975.
Rehearings Denied May 30, 1975.
*301 Jack A. Brittain, Brittain & Williams, Natchitoches, for plaintiff-applicant in third party demand.
James A. Bolen, Jr., Bolen & Halcomb, Alexandria, for defendants-respondents. in third party demand.
J. Michael Percy, Polk, Foote, Randolph, Percy & Ledbetter, Alexandria, for defendants-respondents.
*302 Chris J. Roy, Gravel, Roy & Burnes, Alexandria, for plaintiff-applicants.
Jack O. Brittain, Brittain & Williams, Natchitoches, for defendants-respondents in main demand.
CALOGERO, Justice.
Plaintiff, Eddie Rosenberger, a part-time rodeo contestant, was injured on February 20, 1971 while participating in a bareback bronco riding contest at the Rapides Parish Coliseum in Alexandria, Louisiana. The accident occurred when plaintiff's left knee struck the edge of a partially opened gate as plaintiff's assigned horse attempted to go through the gate. The injury to plaintiff's knee was serious, requiring surgery and resulting in some degree of permanent disability.
The rodeo in which plaintiff participated was sponsored and was being conducted by the Central Louisiana District Livestock Show, Inc. (hereinafter called Central). Central had leased the Rapides Parish Coliseum, including its rodeo equipment, from the Rapides Parish Coliseum Commission, an agency of the Rapides Parish Police Jury, and had hired Woodrow DeWitt under an oral contract to furnish the stock and organize and supervise the rodeo. DeWitt in turn had hired numerous additional employees including the rodeo boss, William Lewis. DeWitt had also had the rodeo sanctioned by the Louisiana Rodeo Association, Inc. of which all the rodeo contestants were members.
The lease from the Police Jury to Central prevented Central from subleasing the Coliseum to any other person. It further required that Central obtain insurance to cover any injuries or claims arising out of the use of the facility. In compliance with this provision of the lease, Central had secured a policy of liability insurance from Southern Farm Bureau Casualty Company. Plaintiff attempted to make Southern Farm Bureau a party defendant by offering a supplemental and amended pleading after the presentation of his case in chief. The trial judge refused to allow plaintiff to file the proceeding at that late stage in the trial. Consequently, the insurer of Central is not a party defendant in these proceedings.
Plaintiff's law suit was brought against Central, the Rapides Parish Police Jury and their insurer, Continental Insurance Company, Louisiana Rodeo Association, Inc., Woodrow DeWitt, and William Lewis. The trial court found negligence on the part of Central and the defendants DeWitt and Lewis, whom the court found to be employees of Central. The trial court further found no contributory negligence nor assumption of risk by plaintiff, and consequently granted judgment in plaintiff's favor in the sum of $33,679.54 against Central, DeWitt, and Lewis, jointly and in solido. The court found that the Louisiana Rodeo Association and the Rapides Parish Police Jury, and consequently its insurer Continental, were not liable and dismissed with prejudice the suit as to these defendants.
Central had filed third party actions against DeWitt, Lewis, the Louisiana Rodeo Association, and the Rapides Parish Police Jury to recover any amounts it might be condemned to pay plaintiff. DeWitt and Lewis had filed third party claims against the Police Jury and the Louisiana Rodeo Association for such amounts us they might be required to pay. The trial court dismissed all the third party claims with prejudice.
Only Central, DeWitt and Lewis appealed the trial court judgment. The Court of Appeal reversed and rendered judgment in favor of defendants, rejecting plaintiff's demands at his cost. They found that plaintiff had failed to prove negligence on the part of defendants and observed that even if defendants had been negligent, plaintiff would be barred from recovery because he assumed the risk of the type of accident which occurred. Rosenberger v. Central La. Dist. Livestock Show, Inc., 300 So.2d 626 (La.App. 3rd Cir. 1974).
*303 Writs were timely sought in this Court by plaintiff. We granted his application on November 22, 1974, 303 So.2d 175 (La.1974). On that same day (November 22), defendants Central, DeWitt and Lewis filed in this Court a pleading entitled Opposition to Application for Writs, in which defendants argued that plaintiff's application should not be granted. The pleading also contained an alternative application for writs. In the event that we should grant plaintiff's application, defendants Central, DeWitt and Lewis sought a writ of review so that all issues and all incidental demands (including the third party claims), could be considered. November 22, 1974, the date this pleading was filed, was forty-three days after denial of rehearing by the Court of Appeal. Under Rule X, Section 4(b) of the Rules of this Court, the application was late. Inasmuch as we have not heretofore acted upon the alternative writ application contained in defendants' opposition we do hereby deny the application without considering its merit because it was not timely filed. Consequently, the third party claims are not before us for resolution.
As evident from the foregoing, the principal issues are whether defendants Central, DeWitt, and Lewis were negligent, and alternatively, whether plaintiff assumed the risk of the injuries which he sustained. Our review of the record leads us to conclude that the decision of the trial judge was correct in regard to both issues.
Central, a non-profit corporation, was conducting its annual district livestock show for 4H and Future Farmers of America club members in the Rapides Parish area and in connection with that show had arranged for a rodeo to be held beginning February 20 in the Rapides Parish Coliseum in Alexandria. As earlier indicated Central employed DeWitt under an oral contract, under the terms of which DeWitt was to furnish the stock and was to organize and supervise the rodeo for Central. DeWitt in turn engaged Lewis and some fourteen additional employees to work under Lewis' supervision. The events leading up to plaintiff's injury were correctly summarized by the Court of Appeal as follows:
"A large number of contestants desired to participate in the rodeo, and it was impossible for all of them to compete during the `regular show,' that is, the part of the rodeo which was conducted before paid spectators. It was arranged, therefore, as is usually done under those circumstances, that the contestants who did not compete during the regular show would do so during the `slack' part of the rodeo, that is, during the period immediately after the regular show was over and after the spectators had left.
Plaintiff entered the bareback bronco riding contest. He was unable to compete during the regular show, but he did ride during the `slack' part of the rodeo, after the regular show had been completed, on February 20. At the time scheduled for him to participate, he mounted a horse in a bucking chute located in the northeast part of the oval shaped arena. When the chute was opened the bucking horse being ridden by plaintiff moved along the west side of and down to the south end of the arena. When the horse reached a point in the southeastern part of the arena, it attempted to go through a gate which happened to be partially open, and in doing so, it caused plaintiff's left knee to strike the edge of the gate resulting in injuries which form the basis for this suit.
. . . . . .
All parties agree that a bucking horse ordinarily will attempt to go through a partially opened gate, or any other opening, in an effort to get out of the arena or to dislodge the rider, and that it thus is dangerous for a gate leading into or from the arena to be left open or partially open while a contestant is riding a bucking bronco. Plaintiff would not have attemped to ride the bucking horse *304 on that occasion if he had known or observed that the gate was partially open. Anyone familiar with rodeos who may have seen or known that the gate was open while the bucking bronco contest was in progress would have foreseen that an accident likely would occur if and when the bucking horse, still bearing its rider, got to that end of the arena.
The last event which was held in the south end of the arena before the above mentioned accident occurred was the `bull dogging' contest.... After that event was completed the gate which plaintiff later struck was closed and `tied' shut with a rope by one of DeWitt's employees, L. D. Johnson, who was working in the production of the rodeo. The rope was tied with a double knot, and there is no question but that it was properly and securely tied, and that the gate could not be opened unless someone actually untied the rope. After the bull dogging contests were completed all of DeWitt's employees and most of the contestants moved to the north end of the arena for the `bull riding' contest, which was the last event of the `regular show.' The bulls used for those contests were released from boxes in the north end of the arena, and after each contest the bull so used was driven out of the arena through a chute in the north end of it.
The regular show ended after several contestants competed in the bull riding contest. Practically all of the spectators then left the arena, and the `slack' part of the rodeo began. The remaining bull riders were the first to compete during the slack period, and the practice was continued of releasing the bulls from boxes in the north part of the arena. After the bull riding events were completed, the bareback bronco riding contests were resumed, and the bucking horses also were released from boxes in the north end of the arena. Plaintiff was the third or fourth contestant who rode a bucking horse during the slack part of the rodeo."
Plaintiff's horse upon being released from the chute, moved down the arena toward the south end. This took approximately eight seconds. During this time, plaintiff's attention was focused on attempting to remain on the bucking horse, and he did not see the open gate until he was three or four feet from it. It was then apparent that the bronco was going to go through the gate, but plaintiff did not have time to jump off the animal or to protect himself in any way.
As was indicated earlier, defendants have contended that plaintiff had assumed the risk of injury because of the inherent danger in a bareback bronco riding contest. We agree that bareback bronco riding is an extremely dangerous activity and we agree that plaintiff assumed the natural and ordinary risks of that type of contest, such as being thrown from the horse, or being run into a wall by the horse. We do not, however, believe the plaintiff assumed the risk of injury from negligent operation or maintenance of the rodeo premises. Furthermore, we find from a review of the record that plaintiff was not aware of the dangerous condition, the open gate, nor could he have been so aware by the exercise of reasonable care. We believe as did the trial judge that plaintiff only assumed those risks ancillary to bronco riding, and not extraordinary risks created by negligently maintained premises.
We turn now to determining whether defendants were negligent in failing to ascertain whether the arena was safe prior to permitting the commencement of plaintiff's ride. In this regard we are in full accord with the findings of the district judge.
Approximately forty-five minutes to an hour had elapsed from the last event during which the gate on the south end of the arena had been used and opened, and three or four events immediately preceding plaintiff's injury in the bronco riding contest had occurred. During this time, the gate on the south end of the rodeo arena had been allowed to become open by DeWitt's *305 subordinates, resulting in plaintiff's serious injuries when his horse tried to run through the partially opened gate.
The evidence clearly indicates that an open gate is a dangerous condition threatening the safety of the bronco rider. Armed with knowledge of an open gate, each and every cowboy would have delayed his ride until the gate was secured. Similarly, if aware of an open gate, the rodeo employees assisting the contestant in mounting his bronco would not have permitted release of the bucking bronco from the chute until the gate was closed. Yet DeWitt and his workmen used no method for checking to assure that the gates around the arena were closed. It was the duty of DeWitt, Lewis and the other employees to check the gates, and particularly to check the one in question prior to plaintiff's ride. We find that they did not do so and that their negligence in this regard resulted in plaintiff's injuries.
The occupier of premises used for athletic events or amusements must maintain the premises in a reasonably safe condition and furnish such equipment or services as is necessary to minimize or prevent injury to others from conditions which probably, or foreseeably may cause damage. See Archote v. Travelers Ins. Co., 179 So.2d 658 (La.App. 4th Cir. 1965), 7 A.L.R.2d 704. In the matter before us the likelihood of an accident occurring because of an open gate was great. Consequently an inspection to insure that all gates were secured should have been made by appropriate rodeo employees.
Defendant Central contends that even if the negligence of DeWitt, Lewis, or other workmen caused plaintiff's injury, it, Central, should not also be held liable. The relationship between Central, DeWitt and Lewis is not free from some doubt. However, a review of the record leads us to conclude that the trial court was correct in finding that DeWitt and Lewis were employees of Central. Central had leased the Coliseum from the Rapides Parish Coliseum Commission. Central was in complete control and charge of all events occurring there and had no right under the lease to sublease the premises. Central employed DeWitt to conduct the rodeo for its pecuniary benefit, for although it is a non-profit organization, Central hoped through the rodeo to make sufficient funds to pay for the Coliseum rental and possibly to secure an additional sum from a sharing of net proceeds. Ticket sales and other proceeds, while their collection was supervised by DeWitt, were turned over to Central to be deposited in its account. Central was to pay for the entire cost for the renting of the Coliseum with the money derived from the ticket sales. Central had the right and the obligation to determine whether or not a rodeo would take place, when it would take place and under what circumstances it would take place. We conclude as did the trial court that Central was in complete control and charge of the rodeo and that DeWitt was essentially an employee of Central. The rodeo boss, Lewis, and the other workmen were in effect employed for Central by DeWitt and worked under the supervision of DeWitt. DeWitt and Lewis were negligent and their employer Central is responsible for that negligent conduct under the doctrine of respondeat superior.
The sole remaining question is whether or not plaintiff is entitled to an increase in his award. Plaintiff sustained a comminuted fracture of his left patella. He underwent a partial patellectomy and now has a 20% permanent disability of the left lower extremity.
Plaintiff was awarded a gross sum of $33,679.54 by the trial court. The major elements comprising this sum were $20,532.04 for wages lost between the date of the accident and the date of judgment, $5,000.00 in the future loss of earnings, and $6,000.00 in general damages for pain and suffering and disability.
With respect to the award, which we are now required to determine in light of our *306 reversal of the Court of Appeal, plaintiff contends that the trial court judgment was correct and appropriate in all respects except the awarding of only $6,000.00 for general damages. He contends that the $6,000.00 sum is inadequate compensation for a very painful injury. Plaintiff had asked in the appellate court for an increase in the amount awarded for general damages by way of a timely answer to defendants' appeals.
We agree with the trial court's award in all respects, including the $6,000.00 award for general damages.
For the foregoing reasons, the judgment of the Court of Appeal is reversed and the judgment of the trial court is reinstated. All costs are assessed against defendants.
SUMMERS, J., dissents for the reasons assigned by the Court of Appeal, 300 So.2d 626.