[Civ. No. 13101. Second Dist., Div. One. May 8, 1942.]

HUGO M. KERSTEN, Appellant, v. ROBERT YOUNG et al., Defendants; BOLLAN, INC. (a Corporation), Respondent.

Roland Rich Woolley for Appellant.

Overton, Lyman & Plumb for Respondent.

WHITE, J.—Plaintiff instituted this action to recover damages for personal injuries sustained by him as the result of being thrown from a horse hired from defendant corporation,

which owned and operated a riding academy and stables. The complaint contained two causes of action, the first of which alleged negligent hiring of the horse by defendant to plaintiff, while the second charged a breach of warranty of suitability of the horse hired by plaintiff from defendant.

By his complaint plaintiff alleged that he was an unskilled rider, incapable of riding any horse other than a gentle and dependable one. In the first cause of action he set forth that notwithstanding the defendant was aware of this fact, it nevertheless negligently and knowingly rented the plaintiff a horse that was addicted to plunging, rearing, jumping, and bolting, and which horse was unsafe for an unskilled rider such as the plaintiff; that defendant knew or should have known of the alleged characteristics of the horse, and that at the time of said hiring plaintiff was ignorant of and unaware of said characteristics. It was further alleged that while plaintiff was riding the horse, it suddenly, without warning or provocation, reared, jumped, bolted and became unmanageable, throwing plaintiff against a tree and to the ground, as a result of which he received serious injuries. The second cause of action, after incorporating the allegations of the first, in addition thereto set forth the contract of hire, and further that defendant warranted the horse so let was a gentle, dependable horse, safe for the plaintiff to ride, and charged a breach of that warranty.

By its answer defendant denied upon information and belief the lack of skill of the plaintiff; denied that it knowingly rented to plaintiff a horse unfit for him to ride, or that it knew that the horse was unfit, or that it should have known that the horse was unfit for the plaintiff to ride. The answer further challenged plaintiff's allegation that he was ignorant of the unfitness of the horse or that the fall was due to the unfitness of the horse or the actions of the animal. The answer also denied the warranty of suitability and the breach thereof, and alleged that the accident was due to the negligence of the plaintiff, in that plaintiff, in attempting to race said horse over the bridlepath in the vicinity of defendant's stables, so negligently handled and managed the horse as to lose his balance on a bend of the path, as a result of which he was thrown as set forth in his complaint. It is conceded that the accident occurred while plaintiff was riding said saddle horse upon a bridlepath in the vicinity of the riding academy maintained by the defendant.

The case was tried before the court sitting with a jury upon the theory of a breach of contract upon an implied warranty of suitability. Upon the completion of plaintiff's case defendant moved for a nonsuit, which motion was granted. From the judgment of dismissal thereupon entered plaintiff prosecutes this appeal.

Stating the evidence *in the light most favorable to the plaintiff* and without regard to conflicts in the evidence, as we are required to do upon an appeal from a judgment of nonsuit, we find in the record testimony that defendant at the time of the accident operated a riding academy commonly known as the Bel-Air Stables, where it let saddle horses to the public. On February 19, 1939, defendant hired and rented a horse to the plaintiff for the latter to ride. Plaintiff, a physician and surgeon, accompanied by his wife and 16-year-old daughter, on the last-mentioned date arrived at the Bel-Air Stables about 8 o'clock in the morning for the purpose of taking a horseback ride. His daughter had called for the horses in advance. Upon the arrival of plaintiff and his family, three horses were brought into the ring, and the horse "Buck Benny" was assigned to plaintiff. His daughter wanted to ride that horse, but Mr. Gordon Smith, the riding master in charge of the stables, refused to permit her to do so, saying, "No, you can't have that horse, you can't ride that horse on that trail . . . no, no, too much horse for you." Thereupon plaintiff said, "No, I will ride this horse. I will follow Mr. Smith's suggestion." Plaintiff further testified that Mr. Smith stated, "He is a high-spirited horse, but he will give you a good ride." It also appears from plaintiff's testimony that he was advised by Mr. Smith that the horse was a privately owned one and that the academy was not in the habit of "letting him out." Plaintiff testified that he first started riding horses some seven years prior to the accident; that he took about six lessons. It further appears that Mr. Smith, who was in charge of the academy stables, accompanied the plaintiff on three or four rides.

After mounting the horse and proceeding out on to the bridlepath, plaintiff testified, "I was on a trot, and Alice came along, the daughter, by the side of me on her horse at a canter, and she was to my right and suddenly she turned with her horse at right angles on to a path going up toward the hill, and my horse, who was following about—oh, I would say, 4 to 6 feet, turned at the same time, or turned following

her horse, and —— . . . he just got into this turn and suddenly swerved back to the left, reared and swayed over to the left, and in so doing he apparently stepped on his foot or lost control of his equilibrium in some way because we landed into a tree, and I landed up against a branch and the trunk of the tree and I stayed there, I fell, and the horse went on.''

Plaintiff also introduced three witnesses who prior to the day of the accident had ridden the horse ''Buck Benny.'' One of these witnesses testified with reference to the horse in question, ''He would jump from side to side all over the bridlepath, because he was such a very well reined horse and had a very touchy disposition, and whenever he would be touched either by the hand or by the heel, he would swerve from one side to the other.'' This witness testified he had considerable experience in riding horses and was a riding master and trainer at the stables where the horse here in question was kept prior to its acquisition by the defendant. Another witness testified that he had been riding horses since 1922; that he had ridden the horse ''Buck Benny'' after the defendant had acquired possession of the animal. He further testified that the horse was nervous and ''seemed to be afraid of the trail,'' and that he ''had a hard time getting him in to the point where the road comes down into the trail again. He refused to go down, and I had quite a hard job with him then, and he was nervous all the way down to the stables.'' This witness further testified that upon his return to the barn he ''told the groom who took the horse that it had been a very bad ride, and I told somebody in the office—I don't know who it was—that I thought the horse was dangerous on the trail and should never be allowed to go out.'' Still another witness testified that he had ridden the horse a few months prior to the accident here in question. This witness stated with reference to his ride on the horse, ''In fact, a few minutes before that he was stubborn, and I could not seem to hold the horse back, and we went under the underpass very rapidly, and crossed out up over the incline or hill, and then I was able by pressing my feet in the stirrups and pulling back with all my strength, I was able to hold the horse, turn him around and go on the way to the corral.''

In support of the judgment as rendered, respondent asserts that the evidence established that no warranty was made to plaintiff, but that on the contrary such warranty was actually

disaffirmed by the defendant; that the latter notified plaintiff of the type and character of the riding horse and of his disposition; that the actions of the horse before plaintiff's ride commenced and during the early stages thereof clearly indicated the nature of the horse; that plaintiff, cognizant of his own inexperience and inabilities as a rider, assumed the risk of continuing to ride the animal; that the accident was the result of the action of plaintiff's daughter and himself and of circumstances which are ordinarily and necessarily incident to the sport of horseback riding, and were not the result of any unusual or abnormal dangerous habit or propensity of the horse of which plaintiff had no notice.

At the outset it should be noted that in a contract of hiring of a horse for riding purposes, in the absence of any notice to the contrary there is contained an implied warranty to the rider that the stablekeeper knows or has exercised reasonable care to ascertain the habits of the horse and that the animal is safe and suitable for the purpose for which the keeper hires the horse to the renter thereof. To inform himself of the habits and disposition of horses which he keeps at his stable for hire is the duty of a stablekeeper, and if he knows or in the exercise of reasonable care should ascertain the fact that his animals are dangerous or unsuitable, he is liable for injuries to his customers resulting from the vicious propensities of animals so hired to his customers. (*Dam* v. *Lake Aliso Riding School,* 6 Cal. (2d) 395, 399 [57 P. (2d) 1315].)

Whether plaintiff was notified by defendant of the type and character of the riding horse with which we are here concerned, and whether plaintiff's conduct in attempting to ride such horse was negligence, were questions of fact upon which the evidence in this case was in conflict. The character of every act depends upon the circumstances in which it is done, and in determining the presence or absence of negligence, the test is not what others would have done in that regard, but rather what would a reasonably prudent person do under similar circumstances. (*Wolfsen* v. *Wheeler,* 130 Cal. App. 475, 483 [19 P. (2d) 1004].) The question presented, therefore, is would a person situated in appellant's position, possessing ordinary prudence, knowing what he knew and seeing what he saw, have used greater caution than he used and refrained from mounting or riding the particular horse in question? There is in the record testimony that defendant had actual knowledge of the propensities and

characteristics of the horse. True, defendant refused in the presence of plaintiff to permit the latter's 16-year-old daughter to ride the horse, but according to plaintiff's testimony, defendant through an agent who had ridden with plaintiff assured the latter that the horse would give him "a good ride."

We may affirm a judgment of nonsuit only when, from a review of the evidence, we can say that, disregarding the fact that there may be a conflict therein, and giving full credit only to that portion of the evidence, whether produced by plaintiff or defendant, which tends to support the allegations contained in plaintiff's complaint, indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict for plaintiff if such verdict were given. (*Estate of Flood,* 217 Cal. 763, 768 [21 P. (2d) 579]; *Estate of Lances,* 216 Cal. 397 [14 P. (2d) 768].) The decision must be left to the triers of fact where different conclusions may reasonably be drawn by different minds from the same evidence. In the instant case it is clear to us that whether the situation in which he found himself was such as to impress upon the mind of appellant the danger incident to his mounting or riding the horse proffered by defendant, was for the jury to decide as a controverted issue of fact.

Except in those cases in which, judged in the light of common knowledge and experience, there is a standard of prudence to which all persons similarly situated must conform, the question of contributory negligence is always one of fact for the jury to decide under proper instructions. It is only in these last mentioned cases that failure to adhere to that common standard is as a matter of law contributory negligence. We are not unmindful of respondent's contention that before appellant commenced his ride and before the horse had left the riding room, it shied, threw its head around, and endeavored to wrest control from the plaintiff; that during the early portion of the ride the horse displayed more or less similar characteristics, and that the accident was the result of plaintiff's daughter's attempt to pass and ride in advance of her father at a canter after she had been warned not to do so; and also respondent's claim that plaintiff's injury occurred by reason of the horse's endeavor to return to the customary riding trail after it had followed the other horse into a side trail where plaintiff's horse lost its equilibrium,

stepped on its foot, reared, and brushed plaintiff against a nearby tree. If in the face of this factual situation, the jury had found for respondent, such an argument might prevail on appeal, but that is not the case, and we are asked to hold that appellant, in acting as he did, was negligent as a matter of law. This we cannot do, because we feel that reasonable minds might well differ on the question whether a man situated as plaintiff was, seeing what he was able to see, and knowing what he knew, would or would not have accepted the horse rented to him by the defendant. Whether at the time and place in question the horse was unsafe or unsuitable for the purpose for which it was hired was also a question of fact for the jury to determine. Therefore, under the conflicting facts and circumstances here present, the negligence of the defendants, the contributory negligence of the plaintiff, as well as the important issue of proximate cause, were all pure questions of fact for the jury to determine in the light of the particular facts and circumstances surrounding the conduct and behavior of the parties litigant, as disclosed by the evidence.

Assuming, as contended by respondent, that a rider under the circumstances here present assumes the risk of the habits and propensities of the horse which are known to him and of which he has been informed, and which are apparent at the time he mounts the animal, when he is afforded an opportunity to request a change of mount, nevertheless in the instant case there is some evidence that respondent had knowledge of the characteristics and propensities of the horse, while at most the evidence concerning plaintiff's knowledge thereof was in conflict. Under well known and established rules, we must disregard the fact that there is a conflict and give full credit only to that portion of the evidence which tends to support the allegations contained in plaintiff's amended complaint, when the appeal is taken from a judgment grounded upon a nonsuit. ■■■ We are not authorized, and neither was the trial court, in determining a motion for a nonsuit, to weigh the evidence or judge of the credibility of witnesses. ■■■ Under the facts as disclosed by the evidence in the case at bar, it was for the jury to determine whether plaintiff had knowledge of existing conditions and should have appreciated, under all the surrounding circumstances, the possibility of the danger involved and of the hazardous position assumed by him in

riding the horse. As was said in *Wilmot* v. *Golden State Inv. Co.*, 41 Cal. App. (2d) 664 [107 P. (2d) 263]:

"The doctrine of assumption of risk is surrounded by the equally stringent boundaries that, before the appellate court can say that a party assumed the risk from which the injury occurred, the evidence must be without substantial conflict in reference to the matter of knowledge or means of knowledge of the existing danger or that such danger was obvious. It is a matter of common knowledge that all construction activities are surrounded by some element of risk of injury, but it is a question of fact in each case whether the conduct of the injured party was in accord with the custom and habits of reasonable men under similar circumstances. The evidence here does not show that there was any unusual risk which the respondent assumed or that his conduct was any different from what other reasonable men under the same circumstances would have followed. These questions all depend upon the facts and circumstances which the jury was required to decide."

It should be understood that throughout this opinion we have taken the evidence most strongly in plaintiff's favor, as we are bound to do where an appeal is taken after the granting of a nonsuit. We wish it understood that we are expressing no opinion as to the weight of the evidence or its truth or falsity.

For the foregoing reasons, the judgment is reversed and the cause remanded for a new trial.

York, P. J., and Doran, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied July 6, 1942.