[Civ. No. 31218. Second Dist., Div. Five. May 28, 1968.]

MARY ANN DOROBEK, Plaintiff and Respondent, v. RIDE-A-WHILE STABLES et al., Defendants and Appellants.

Kirtland & Packard, Lincoln J. Chavez and Ellis J. Horvitz for Defendants and Appellants.

Hecker, Kenealy & McKee and Ronald A. Hecker for Plaintiff and Respondent.

STEPHENS, J.—This is an appeal by defendant from a verdict for plaintiff following a jury trial. The action is one for personal injuries, including medical expenses.

The defendant urges the following contentions on appeal:

''A. The Trial Court Committed Prejudicial Error in Refusing to Give an Instruction Embodying the Doctrine of Assumption of Risk.

''B. Defendant's Duty as a Stable Keeper Was to Exercise Reasonable Care to Ascertain That Its Horses Were Safe and Suitable for Riding Purposes. The Evidence Here Fails to Show That Defendant Knew or in the Exercise of Reasonable Care Could Have Ascertained That Plaintiff's Horse Would

Become Unmanageable or Dangerous on the Occasion of Her Accident.

"C. There Is No Causal Connection Between Plaintiff's Injury and Defendant's Failure to Keep More Complete Records.

"D. The Trial Court Erred in Refusing to Instruct the Jury That the Presumption of Due Care Applied in Favor of Decedent Jack C. Haralson."

The facts are recited herein in the light most favorable to defendant in order to answer contention A. Development of facts relative to the other contentions will be extended as necessary for their individual consideration.[1]

Plaintiff, in the company of a young man (hereinafter referred to as Varolli), went to defendant's riding stable on June 26, 1962 for the purpose of renting a horse to ride in the area of Griffith Park. Plaintiff had rented and ridden a horse from defendant's stable four or five times previously over past years. She was not an experienced horsewoman and had never had riding lessons, though she had some verbal instructions in the art of riding.

On arrival at defendant's stable, she requested the same horse she had ridden previously. The horse, Kro, was not available. She requested a horse of like gentle character, and a horse, presumably Joker, was produced. Joker was saddled with a western saddle.[2] Varolli obtained a horse similarly saddled, and they rode away from the stables toward the bridlepath of Griffith Park. When some 30 or 50 feet from the stables, plaintiff recognized that Joker required strong reining and that he appeared strong-headed. Joker proceeded at a quicker pace than did Varolli's horse, and at the time of the accident was an estimated 50 feet ahead and, due to the conformation of the terrain, out of view of Varolli.

During the course of the ride, which took from 20 to 30 minutes from the time of rental to the time of the accident, plaintiff met several persons riding along the trail or path. There was testimony that during this time Joker pulled from side to side, pranced sideways, and wanted to pull away from her. Though the testimony varies considerably on the point, there is some testimony of witnesses that plaintiff was not walking Joker, but was "riding rather recklessly. She would

---

[1] To say the least, the evidence concerning the events leading up to plaintiff's accident is in sharp and irreconcilable conflict.

[2] There is some testimony that plaintiff was riding bareback, but neither the testimony of defendant's agent who rented Joker nor plaintiff's testimony bears this out.

let the horse canter then pull him up short," and was admonished to slow down; that the plaintiff responded to the admonition by saying she could handle the horse or was capable of handling the horse. Other testimony was that as the plaintiff and witness Kinkade, another girl, rode side by side on the path[3] discussing their respective mounts, plaintiff "said she had a spirited horse."

The Griffith Park bridlepath, in the area involved, extended beneath two tunnels, and after the second tunnel, there was a steep incline, or hill. The area was not one entirely strange to plaintiff for she had ridden over it previously while riding Kro. There is testimony that plaintiff rode through the second tunnel at a quickened pace and then up the hill. There is testimony that the horse trotted, or cantered, or ran up the hill. There is testimony that the horse bucked or kicked up its heels as it progressed up the hill. So there is an irreconcilable conflict as to the plaintiff's horseback ride, with evidence of careful riding to what approaches a rodeo. So far as the ride up the incline is concerned, there was only the one witness who claimed to have seen the action from bottom to top.[4] Witness Kinkade last saw plaintiff riding as plaintiff reached the rise. ▉ At this time plaintiff was hanging onto the saddle horn and her feet were extended over the tail of the horse.[5] The evidence is in conflict as to whether Joker bucked or kicked or not, but there is little, if any, question but that at the area of the accident Joker was cantering, trotting, or running, and that plaintiff unsuccessfully tried to remain on, falling off at the point of the accident.

The employee, one Haralson,[6] who rented Joker to plaintiff had no recollection of Joker, or of complaints about the horse he rented to plaintiff, or that the horse had ever been seen to buck. There is evidence that sometimes, but not always, notations are made of complaints about a horse at the stable, but none were produced as to Joker (or any other rental horse) so far as the record shows. Daily riding records were kept at the stable to show the name of the rider, the name of

---

[3]Kinkade testified she herself was riding bareback on her own horse, and this appears to have been the bareback rider. The manner of plaintiff's handling of the horse, whether bareback or not, was for the jury to determine.

[4]The accident occurred at either the crest of the hill, or on the far side and termination of the incline.

[5]We take judicial notice of the fact that this is not the normal riding position of persons riding along bridlepaths.

[6]All of this witness' testimony was by deposition. He had died prior to the trial.

the horse, the time out and the time in, but sometimes these were not completed; the record showing plaintiff's rental was admitted, and showed the horse's name to be Joker, but no horse's name was recorded for the animal ridden by Varolli.

By answers to interrogatories propounded to him, L. C. Goss[7] identified the horse rented to plaintiff as "Joker," and deposed that the horse had never been involved in an accident prior to the one in question; had never been known to have thrown a rider; and that the horse had been saddled with a western saddle at the time of the rental.

Witness Jennings, at one time an employee of defendant, testified he knew of Joker; that he had purchased him for defendant about three years before the accident; that Joker was a gentle, slow-going horse and had no bad traits; that he was suitable for riding; and that he had never heard any complaints about Joker, or that Joker had bucked. He also testified that many times people would report that the horse they were returning to the stable "almost threw me," but no written record would be made of these comments, nor would any inquiry be made as to what happened to occasion the "almost threw me." His expert opinion was that an experienced horseman can pick out a horse that is in fact gentle. He stated that such an expert horseman, if he paid attention to horses and made an effort to determine the personality of a horse, could tell whether it was more or less inclined to buck or be hard to manage. He testified that he had seen horses at this stable about which he would tell the owner (Goss), "That horse is acting a little difficult. Maybe we ought to consider getting rid of him," and though not immediately, later the horse would be disposed of. These conclusions by Jennings would be through his observations, and not through complaints from patrons. In that expert's opinion, it would be taking a chance for a stable to keep a horse which wanted to "go ahead" and which exhibited too much spirit, if rented to the average rider; such a horse, if restrained by a rider for 15 or 20 minutes would be irritated, twist from side to side, and lunge to dislodge the rider.

On this evidence, defendant argues that the evidence supports an instruction on assumption of risk, and that failure to so instruct as requested was prejudicially erroneous. The basic contention relative to the construction of facts is that plaintiff continued to ride the horse with the knowledge that

---

[7]L. C. Goss was the stable owner, but he died prior to the trial, and the representative of his estate was substituted as defendant.

it was headstrong and spirited. While the evidence of recognition of the risk may seem tenuous, we cannot say as a matter of law that the defense should not have gone to the jury.

But the analysis set forth in *Grey* v. *Fibreboard Paper Products Co.*, 65 Cal.2d 240 [53 Cal.Rptr. 545, 418 P.2d 153] (decided subsequent to the trial of the instant case) is pertinent and determinative of the question of whether such failure to instruct was prejudicial error in the light of instructions given on contributory negligence. In the *Grey* case, the fact of actual knowledge of the specific risk was far stronger than in the case at bar. In the *Grey* case, the court said (at pages 245-246):

"While contributory negligence and assumption of risk are two different legal doctrines, one being based on a failure to exercise due care in the circumstances and the other being based upon voluntary exposure to a known risk, it is nevertheless true that the two doctrines overlap in many situations. The commentators universally recognize that the term 'assumption of risk' has been used by the courts to describe several kinds of situations whose real differences should demand different kinds of treatment. To simplify greatly, it has been observed (see 2 Harper and James, The Law of Torts, p. 1162 et seq.; Prosser, Handbook of Law of Torts (3d ed.) p. 450 et seq.) that in one kind of situation, to wit, where a plaintiff *unreasonably* undertakes to encounter a specific known risk imposed by a defendant's negligence, plaintiff's conduct, although he may encounter that risk in a prudent manner, is in reality a form of contributory negligence which may be defined as follows: ' . . . conduct on the part of the plaintiff which falls below the standard to which he should conform for his own protection, and which is a legally contributing cause co-operating with the negligence of the defendant in bringing about the plaintiff's harm.' (Rest. 2d Torts, § 463, p. 506.) Other kinds of situations within the doctrine of assumption of risk are those, for example, where plaintiff is held to agree to relieve defendant of an obligation of reasonable conduct toward him. Such a situation would not involve contributory negligence, but rather a reduction of defendant's duty of care.

"It is evident that the instant case presents an example of the first of the foregoing situations. The testimony presented would support, but not compel, a finding that plaintiff unreasonably proceeded in a situation of known danger. As such, the 'assumption of risk' here involved is but a variant of contributory negligence, and as the jurors were instructed,

in effect, that plaintiff could not recover if his negligence concurred with the negligence of the defendant to contribute in some degree in proximately causing the damage, no prejudice is demonstrated. The jurors necessarily determined that plaintiff was not negligent in any degree; in other words, that his conduct did not fall 'below the standard to which he should conform for his own protection,' and was not a 'contributing cause co-operating with the negligence of the defendant in bringing about the' harm. Thus, the jurors absolved plaintiff of any misconduct in jeopardizing his well-being, and necessarily determined that he did not unreasonably undertake to encounter a specific known risk, the prerequisite upon which the particular defense of assumption of risk must be based.

"Although it was error not to instruct the jurors on the doctrine of assumption of risk, it is not reasonably probable that a result more favorable to defendant would have been reached in the absence of the error. Accordingly, there has been no miscarriage of justice. (Cal. Const., art. VI, § 4½; *People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].)"

Defendant here argues that the erroneous failure of the court to instruct on assumption of risk was compounded when the court gave an instruction relating to certain signs. The signs on the bridlepath read: "No running of horses," and those at the stable rental window purported to exempt the stable from responsibility for accidents. The court instructed: "In this case, there has been some testimony relating to a sign or signs on the premises of the defendant stable which signs purport to exempt the defendant stable from any liability in case of accident. You are instructed that said declarations are of no legal effect and are not to be considered by you in your deliberations on the issue of liability."

The facts could reasonably be construed to indicate a knowledge of danger by plaintiff, when she left the stable, but the suggestion in stable signs giving notice of general risk to a rider does not strengthen defendant's case. We do not see any "compounding" of error under the circumstances, nor do we find the failure to instruct on assumption of risk prejudicial in the light of the instruction given on contributory negligence.

 The second contention of defendant to the effect that the evidence fails to show that defendant knew, or in the exercise of reasonable care could have ascertained, that the horse would be unmanageable or dangerous is without merit. From the very evidence upon which defendant relies to estab-

lish the necessary elements of assumption of risk, the propensity of the animal becomes apparent. The only question then is whether the dangerous propensity was known or could have been known to defendant at the time of the rental.

The expert opinion previously noted went directly to the issue of negligence on the part of the stable operators in renting a horse with a dangerous propensity to a person unknowledgeable of such propensity. The expert opinion as to the ability of a qualified and experienced horseman to ascertain the dangerous propensities of an animal before they were obviously exhibited placed the issue as to the care exercised by defendant squarely in issue.

██ The defendant urges that there was no evidence to establish a causal connection between plaintiff's injury and defendant's failure to keep more complete records. We agree, but this does not make error plaintiff's effort to establish recorded knowledge of a dangerous characteristic noted in the records maintained. Negligence of defendant was before the jury through the referred to testimony of the expert. Certainly if an expert horseman can tell if a horse has dangerous characteristics by proper observation of the horse, defendant's failure to make such observation was negligence, and there was no necessity for plaintiff to establish prior acts of the horse and knowledge thereof by defendant. The least that the public can expect is that a public stable operator has that quantum of expertise experienced horsemen possess.

The instruction complained of makes no reference to "records," but rather expresses the duty to exercise reasonable care to observe that which was to be seen. It was a proper instruction.

As was stated in *Dam* v. *Lake Aliso Riding School,* 6 Cal.2d 395, 400 [57 P.2d 1315] : "We are of the opinion that the foregoing statement by the Supreme Court of Pennsylvania in the *Conn* [*Conn* v. *Hunsberger,* 224 Pa. 154 [73 A. 324, 25 L.R.A. N.S. 372, 16 Ann. Cas. 504, 132 Am.St.Rep. 770]] case exhibits the reasonable rule which should be approved and applied here. Under this rule the so-called implied warranty is not a warranty in that sense which insures the suitableness of the horse, but is only a contractual obligation assumed against reckless or heedless hiring out of a horse without reasonable care to ascertain the habits of the animal with respect to its safety and suitability for the purpose for which it is hired." It is as unreasonable for us, as it must have been to the jury, to conclude that the propensities of a horse as

spirited and fractious as the one here involved could reasonably have escaped the knowledge and attention of its keeper over the years of its possession by him.

■ The fourth and last contention of defendant is that error occurred in the refusal to instruct that the presumption of due care applied in favor of decedent Haralson, an agent of defendant. Haralson deposed regarding the happenings of this case so far as he had knowledge, to the fullest extent foreseeable, and his deposition was read into evidence. While the deposition was taken by plaintiff, the disability from which Haralson died and its seriousness were known to defendant.[8] The circumstances surrounding Haralson's part as played in this case were fully explored at the time of the deposition. We believe the exception to the presumption of due care set forth in *Laird* v. *T. W. Mather, Inc.*, 51 Cal.2d 210 at p. 221 [331 P.2d 617] is here applicable.[9] There it was held that an instruction on the presumption of due care is not proper when the party who seeks to invoke it testifies concerning the conduct immediately prior to or at the time in question.

The judgment is affirmed.

Kaus, P. J., and Aiso, J. pro tem.,* concurred.

Appellants' petition for a hearing by the Supreme Court was denied July 24, 1968.

---

[8]"Mr. Kenealy [attorney for plaintiff]: I have no other questions.
"The balance is just directed to establishing his [Haralson's] inability to come to court and has nothing to do with——
"Mr. Chavez [attorney for defendant]: May that be read, counsel?
"Mr. Kenealy: Certainly.
"Cross-Examination
"By Mr. Hunter [attorney for defendant, present at the deposition]: Q Mr. Haralson, do I correctly assume that you are presently under an illness?
"A Yes.
"Q What is the nature of that illness, please?
"A Emphysema—what they call it?
"Q It is really a respiratory condition?
"A Yes, and a heart condition.
"Q How long have you had this condition?
"A Oh, it's been coming on for two years.
"Q Do you have any activity wherein you are able to go outside the house?
"A No. Sometimes I walk a couple of blocks up here, you know, and back.
"Q What would the present likelihood be of your ability to attend trial if you were subpoenaed as a witness?
"A I run out of wind. I couldn't make it.
"Mr. Hunter: No further questions."
[9]We recognize that in *Laird*, the witness was not deceased at the time of trial.
*Assigned by the Chairman of the Judicial Council.