[No. B036168. Second Dist., Div. Seven. Oct. 15, 1993.]

CHARLENE I. HARROLD et al., Plaintiffs and Appellants, v.
ROLLING J RANCH et al., Defendants and Respondents.

COUNSEL

Shernoff, Scott & Bidart and Marian H. Tully for Plaintiffs and Appellants.

Cassidy, Warner, Brown, Combs & Thurber and David K. Thurber for Defendants and Respondents.

## OPINION

**WOODS (Fred), J.**—This appeal is one of several implied assumption of the risk cases which the Supreme Court remanded for reconsideration in the light of *Knight* v. *Jewett* (1992) 3 Cal.4th 296 [11 Cal.Rptr.2d 2, 834 P.2d 696]. When first decided by this court in 1990, we reversed a summary judgment in favor of defendant. In that opinion we first discussed the unsettled state of the law in the area of implied assumption of the risk and whether it was subsumed under comparative negligence, urging the Supreme Court to take and decide the issue. We then addressed the case before us,

assuming for that purpose the implied assumption of the risk defense indeed survived the advent of comparative negligence. We applied the then prevailing test which focused on the plaintiff's subjective appreciation and voluntary acceptance of a specific risk. We found there was a triable issue whether the plaintiff was aware of the specific risk—the dangerous propensity of the horse defendant assigned her to ride—and thus whether she could be deemed to have voluntarily undertaken that risk.

The Supreme Court granted review and held this case along with more than a dozen other implied assumption of the risk cases while it decided *Knight* v. *Jewett, supra,* and *Ford* v. *Gouin* (1992) 3 Cal.4th 339 [11 Cal.Rptr.2d 30, 834 P.2d 724]. In those opinions the high court determined implied assumption of the risk had survived comparative negligence. However, a "plurality" of the court rejected the definition of implied assumption of the risk we had used in deciding the instant case in 1989. Instead of the plaintiff's subjective state of mind the plurality ruled the inquiry should shift to the defendant's duty to the plaintiff in the context of the activity in which plaintiff was engaged. Only if we conclude defendant owed no duty to plaintiff does the implied assumption of the risk defense operate as a complete bar to plaintiff's cause of action. If a duty was owed, then plaintiff's reasonable or unreasonable assumption of the risk which defendant had created is merely one of the factors in the comparative negligence equation.

Applying the *Jewett* plurality's test to the facts of the instant case, we conclude a riding stable offering short term trail rides to casual riders owes a duty to those to whom it rents horses to minimize the risk of harm—or at least not to aggravate that risk—by supplying reasonably safe horses or warning riders of the propensities of those which pose a danger. But under the peculiar facts of this very close case that duty did not materialize. We further conclude under *Jewett* that primary assumption of the risk bars plaintiff's recovery as a matter of law.

### STATEMENT OF FACTS AND PROCEEDINGS BELOW

The following summary of the facts is based on allegations in plaintiff's complaint which were not controverted by defendant's evidence at the summary judgment proceeding as well as evidence adduced in connection with the summary judgment motion.

In September 1983, plaintiffs Charlene and John Harrold (collectively referred to as the Harrolds) became members of a resort owned by defendant Great Outdoor American Adventures, Inc. (GOAA). In November 1983, the Harrolds took a weekend vacation at GOAA's resort.

There, the Harrolds learned GOAA offered horseback riding to its members at nearby stables. The stables were operated by defendant Rolling J Ranch.

Charlene Harrold, two of her friends, and two young girls chose to go horseback riding. GOAA transported the group to the Rolling J stables. There, the group members were given their choice of horses. Ms. Harrold initially chose one horse but, after some misgivings, selected another horse to ride for the day. After the riders selected their horses, Rolling J employees saddled the horses.

The five riders were escorted by two wranglers. One wrangler rode at the head of the group and the other at the end. The wranglers were employed by Rolling J. Before starting the ride, the riders were instructed on certain basics of horseback riding, such as how to signal and command the horse. The riders were also warned not to run the horses.

About 20 to 30 minutes into the ride, one of the young girls complained she was cold. Ms. Harrold decided to give the jacket she was wearing to the young girl. Having experienced no problems with the horse during the ride, Ms. Harrold wrapped the reins around the saddle horn. She then started to remove her jacket from her shoulders.

While both of her arms were still in the sleeves and caught behind her, the horse suddenly spooked. Ms. Harrold tried, but was unable, to remain on the panicked horse. When the horse bucked for the second time, Ms. Harrold was thrown to the ground landing on her tailbone.

Unbeknown to Ms. Harrold, on a previous ride, this same horse had spooked and thrown a rider when that rider took off and waved a hat. Defendants neither warned Ms. Harrold of this prior incident nor did they retrain the horse to avoid the recurrence of a similar incident.

The Harrolds commenced an action against defendants GOAA, Rolling J, and Jack Suderman alleging defendants negligently failed to warn Ms. Harrold of her horse's unstable temperament and tendency to throw riders and failed to provide her with a safe horse to ride.[1] The Harrolds also alleged defendants negligently maintained their premises and willfully failed to warn of the property's dangerous condition.

---

[1]Although named as a defendant, the record does not contain any documents filed on Mr. Suderman's behalf. There is no indication he was served with the complaint or, if so, that Mr. Suderman filed an answer. Accordingly, all future references to the defendants are intended to include only GOAA and Rolling J.

Defendants answered by filing a general denial and, inter alia, raised the affirmative defense of assumption of risk. Defendants subsequently moved for summary judgment solely on this affirmative defense. Defendants argued Ms. Harrold, by virtue of her experience as a rider, knew of the risks involved in horseback riding and voluntarily assumed such risks when she commenced the ride.

The evidence before the trial court concerning the summary judgment motion showed Ms. Harrold had prior experience with horses. However, the evidence was in conflict as to the degree of her expertise.

Ms. Harrold knew how to guide a horse to the left and right, make it stop, trot, and gallop, and how to bridle and saddle a horse. In a note prepared for the stables explaining how the accident occurred, Ms. Harrold wrote: "I am an experienced rider and I understand that I was the second person thrown by the same horse. I guess even the best are thrown. . . . Accidents happen." In her deposition, Ms. Harrold explained her reference to "the best being thrown" was not intended to refer to herself. Rather, it was a general comment referring to "any good rider." Further, she considered a person to be an experienced rider if she could saddle and ride a horse.

The evidence also showed Ms. Harrold never rode a horse more often than once a month, she had never been a member of a riding club or academy, and she had never taken care of horses or fallen off of one. Further, she always rode with one of her adult sons. Additionally, she had only ridden a horse once in the five years preceding the accident.

The trial court granted the summary judgment motion, stating: "Maybe it's because of the disadvantage. I have a little too much knowledge of . . . horses, and that's why I think when you get on a horse and you are going to ride on [sic] the outdoors, whether there are wranglers all over, you are assuming a risk that you can fall off the horse." The Harrolds timely appealed.

DISCUSSION

I. *Standard of Review*.

The standard of review for summary judgments is well settled. Where defendants move for summary judgment, their declarations and admissible evidence must either establish a complete defense to the plaintiff's action or conclusively negate a necessary element of the plaintiff's case and demonstrate, under any cause of action, no material factual issue requires resolution

by trial. (*DeRosa* v. *Transamerica Title Ins. Co.* (1989) 213 Cal.App.3d 1390, 1395 [262 Cal.Rptr. 370].) Thus, summary judgment is proper here only if the defendants are legally entitled to raise the assumption of the risk defense and have conclusively established all of the necessary elements of that defense.

## II. *The Implied Assumption of the Risk Defense After Jewett.*

 While recognizing there is a profound analytical schism on our high court as to assumption of the risk doctrine, we reexamine and decide this case under the plurality view which holds the critical inquiry is whether the riding stable owes a duty of care to riders who rent horses for trail rides. Having been well focused by the high court on the element of *duty* in *Jewett*, unlike our previous holding, we now conclude there are no triable issues as to whether the assumption of the risk defense constitutes an absolute bar to appellants' action. Accordingly, summary judgment was proper and we affirm the judgment.

 Under the analysis adopted in the "plurality" decision in *Jewett*, assumption of the risk is an absolute defense only when public policy dictates the class of which a defendant is a member should owe no duty of care to the class of which a plaintiff is a member in relation to the activity in which they are involved. According to this analysis, the inquiry does not begin with the question whether the *plaintiff* assumed the risk, in this instance the question whether this rider subjectively comprehended the precise risk this particular horse was easily spooked. Rather the inquiry begins—and ends—with an analysis of whether the *defendant* owed a duty to a plaintiff after assessing factors such as those listed in *Rowland* v. *Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496].

This is the form of analysis the plurality itself used in *Jewett* to determine whether primary assumption of the risk applied. In that case, the parties were coparticipants in a touch football game. Most if not all participants in such competitive contact sports are aware there is a risk of injury through overexuberant play by other players. But that subjective appreciation of risk was not the focal point of the Supreme Court's attention. Rather the plurality opinion, at least, looked to the policy implications of imposing a duty of care on participants toward their coparticipants in these contests. The high court decided public policy considerations militated against a duty of care, prima-rily because "vigorous participation in such sporting events likely would be chilled if legal liability were to be imposed on a *participant* on the basis of his or her ordinary careless conduct. . . . [E]ven when a *participant's* conduct violates a rule of the game and may subject the violator to internal

sanctions prescribed by the sport itself, imposition of *legal liability* for such conduct might well alter fundamentally the nature of the sport by deterring *participants* from vigorously engaging in activity that falls close to, but on the permissible side of, a prescribed rule." (*Knight* v. *Jewett, supra,* 3 Cal.4th 296, 318-319.)

■ Thus, under the plurality view in *Jewett* the question whether the rider in this case was subjectively aware of the precise danger (the horse she rented had a predisposition to spook) and voluntarily chose to ride this particular horse despite that knowledge is irrelevant to whether the riding stable which rented her the horse owed her a duty of care to provide safe horses or at least warn riders of dangerous ones. The analysis here as in *Jewett* properly focuses on the policy factors affecting the defendant's duty to the plaintiff in the context of this particular activity. The question is: Do riding stables in the business of renting horses to members of the general public for purposes of trail rides owe a duty of due care toward those who rent those horses?

III. *Commercial Riding Stables Owe a Narrow Duty of Due Care (Not Applicable in This Case) to Those Members of the General Public Who Rent Horses From Them.*

*Jewett* and its companion case, *Ford* v. *Gouin, supra,* answered one set of questions in the field of recreational activities—the extent of the duties *participants* in recreational activities owe to each other. However, although once again arising in the context of recreational activities, the instant case raises a different issue—the duties commercial operators of recreational activities owe to members of the public to whom they sell their recreational services.

Though neither *Jewett* nor *Ford* ruled directly on the issue of a commercial recreational facilities' duties to its patrons, *Jewett* contains extensive discussion of this issue in the course of explaining the scope and rationale of primary assumption of the risk. In this discussion, the Supreme Court went out of its way to distinguish between participants and commercial operators, emphasizing commercial operators of recreational facilities, such as baseball parks and ski resorts, might owe duties to other participants and spectators which participants would not owe to participants or to spectators.

As the high court observed: "[T]he scope of the legal duty owed by a defendant frequently will also depend on the defendant's role in, or relationship to, the sport.

"The latter point is demonstrated by a review of one of the numerous cases involving an injury sustained by a spectator at a baseball game. In

*Ratcliff* v. *San Diego Baseball Club* (1938) 27 Cal.App.2d 733 [81 P.2d 625], a baseball spectator was injured when, walking in the stands between home plate and first base during a game, she was hit by an accidentally thrown bat. She sued both the player who threw the bat and the baseball stadium owner. The jury returned a verdict in favor of the player, but found the stadium owner liable. On appeal, the Court of Appeal affirmed.

"Had the *Ratcliff* court utilized an implied consent analysis, the court would have looked only to the knowledge of the particular plaintiff (the spectator) to determine whether the risk of being hit by an accidentally thrown bat was an inherent risk of the sport of baseball assumed by the plaintiff, and would have treated the plaintiff's action against both defendants similarly with regard to such risk. The *Ratcliff* court did not analyze the case in that manner, however. Instead, the court implicitly recognized that two different potential duties were at issue—(1) the duty of the ballplayer to play the game without carelessly throwing his bat, and (2) the duty of the stadium owner to provide a reasonably safe stadium with regard to the relatively common (but particularly dangerous) hazard of a thrown bat. Because each defendant's liability rested on a separate duty, there was no inconsistency in the jury verdict absolving the batter of liability but imposing liability on the stadium owner for its failure to provide the patron 'protection from flying bats, at least in the area where the greatest danger exists and where such an occurrence is reasonably to be expected. [Citation omitted.]' " (*Knight* v. *Jewett, supra,* 3 Cal.4th 296, 317.)

The plurality opinion in *Jewett* likewise explained the duty of care a commercial sports operator owes *participants* (as contrasted to spectators). "Although defendants generally have no legal duty to eliminate (or protect a plaintiff against) risks inherent in the sport itself, it is well established that defendants generally *do have a duty to use due care not to increase the risks to a participant over and above those inherent in the sport.* Thus although a ski resort has no duty to remove moguls from a ski run, it clearly does have a duty to use due care to maintain its tow ropes in a safe, working condition so as not to expose skiers to an increased risk of harm. The cases establish that the latter type of risk, posed by a ski resort's negligence, clearly is not a risk (inherent in the sport) that is assumed by a participant." (*Knight* v. *Jewett, supra,* 4 Cal.App.4th 296, 315-316, italics added.)

■ The general principle which may be extracted from this discussion in *Jewett* is that commercial operators of sports and recreational facilities owe a duty of care to their patrons. In general terms, that duty is to ensure the facilities and related services which are provided do not increase the risk of injury above the level *inherent* in the sport or recreational activity itself. A

commercial operator violates this duty if, for instance, it sells or rents its patrons defective equipment which aggravates the patrons' risk of injury.

The recreational activity here, of course, was horseback riding, specifically supervised trail riding with horses rented from the commercial operator of this horse-riding recreational service and with "wranglers" the operator employed to guide and supervise the trail ride. The commercial operator received compensation from the riders, both for renting them the horses and supplying them with "wranglers."

■ There is no doubt horseback riding, even the rather tame sport of riding on the back of walking horses in an afternoon trail ride, carries some inherent risk of injury. A horse can stumble or rear or suddenly break into a gallop, any of which may throw the rider. But this does not necessarily mean the commercial operator of the horse-riding facility owes no duty of care to those who rent its horses and can never be liable for injuries suffered because a horse stumbles, rears, or suddenly breaks into a gallop. The commercial operator has a duty to supply horses which are not unduly dangerous.[2] Furthermore, the operator owes the duty to warn the patrons renting a given horse if that horse has evidenced a predisposition to behave in ways which add to the ordinary risk of horse riding.

---

[2]Defendants initially argued there was no evidence in the record before the trial court demonstrating the horse Ms. Harrold rode had a propensity to throw its riders. In connection with this argument, defendants objected to the Harrolds' inclusion of Paula Gow's deposition and the third volume of Ms. Harrold's deposition in the appendix in lieu of clerk's transcript because neither deposition was before the trial court. The record reflects defendants' counsel specifically stipulated to the Harrolds' use of the deposition at the summary judgment hearing subject to an objection at that time and that no such objection was made. However, the record does not indicate whether the deposition was in fact before the trial court.

Because of this ambiguity in the record, we requested supplemental briefing concerning what evidence was presented to the trial court concerning the horse's propensity to spook or throw riders. In response, the Harrolds cited to some evidence supporting that conclusion but also argued properly that the burden rested with defendants to provide competent admissible evidence which controverted the Harrolds' allegations concerning the horse's propensities.

The Harrolds had no duty to produce evidence establishing the horse's propensity to spook or throw other riders in the absence of contrary evidence. As this court held in *Witchell* v. *De Korne* (1986) 179 Cal.App.3d 965, 976-977 [225 Cal.Rptr. 176], "[i]t is the burden of a moving defendant, in order to succeed on a motion for summary judgment, to controvert *all* of the material allegations of plaintiff's complaint. The failure to do so precludes summary judgment." (Italics added; accord, *Brown* v. *Bleiberg* (1982) 32 Cal.3d 426, 438 [186 Cal.Rptr. 228, 651 P.2d 815] ["a court may not consider the allegations of the complaint '*except to the extent that they are not controverted by affidavits on either side*'"], original italics; *Pena* v. *W.H. Douthitt Steel & Supply Co.* (1986) 179 Cal.App.3d 924, 929-930 [225 Cal.Rptr. 76]; *Conn* v. *National Can Corp.* (1981) 124 Cal.App.3d 630, 638-640 [177 Cal.Rptr. 445].)

Here, the Harrolds alleged "[d]efendants willfully failed to warn Plaintiff CHARLENE I. HARROLD of the unstable temperament of the horse and/or tendency to throw riders, in spite of the fact that Defendants knew, or in the exercise of reasonable diligence should have known, that the horse had previously thrown riders." Defendants failed to controvert this

This level of duty is consistent with duties owed by commercial operators of other forms of recreational facilities such as ski resorts. Skiing is an inherently dangerous sport. But this does not mean ski resort operators avoid owing a duty to skiers to supply them with nondefective ski lifts and trails. (*Sunday* v. *Stratton Corp.* (1978) 136 Vt. 293 [390 A.2d 398] [ski resort owes duty to skiers to properly groom novice trail]; cases collected in Annot. (1979) 95 A.L.R.3d 203.) Nor does the inherent danger which goes along with participating in or watching other sports mean the commercial operators of facilities offering these activities owe no duty of care toward participants or spectators. (*Meistrich* v. *Casino Arena Attractions* (1959) 31 N.J. 44 [155 A.2d 90, 82 A.L.R.2d 1208] [ice rink owes duty to skaters not to supply unusually hard and slippery ice]; *Rosenberger* v. *Central Lousiana Dist. Livestock Show, Inc.* (La. 1975) 312 So.2d 300 [rodeo arena owes duty to spectators regarding operation and maintenance of arena].)

Likewise, a whole host of duties can be ascribed to commercial providers of horse-riding facilities, i.e., not to provide faulty saddles, bridles and other equipment, not to provide dangerous trails, not to provide horses that are shodded poorly—and the list can go on and on. However, in this case we stop short of imposing a duty on stable owners to provide "ideal" riding horses such that they never buck, bite, break into a trot, stumble or "spook" when confronted by a frightening event on the trail such as a shadow or snake or react to peculiar movements of a rider such as excessive spurring or waving of a coat as in this case. We view sudden movements of a horse just as inherent in horseback riding as the presence of moguls on a ski slope are to skiers.

Public policy supports not imposing a duty on commercial operators of horse-renting facilities which provide supervised trail rides, to supply "ideal" horses, but we stop short of eliminating any duty such as a duty to warn of a dangerous propensity in a given horse. However, the one prior incident of the subject horse having spooked does not rise to the level of a dangerous propensity, in our opinion. It does rise to the level of a "horse behaving as a horse" with no incumbent duty on the part of the stable operator. In our opinion, to impose some sort of duty on a lessor of horses when a "horse acts as a horse" is to tell the commercial world that strict liability is imposed for any action of a horse inherent in horseback riding, with the concomitatant result that in all probability all commercial horseback riding will cease because of the risk involved to those that are self-insured or by reason of the prohibitive expense to obtain liability insurance for such an enterprise.

---

allegation. Accordingly, we must assume the allegation is true. (See *Brown* v. *Bleiberg, supra,* 32 Cal.3d at pp. 438-439; *Conn* v. *National Can Corp., supra,* 124 Cal.App.3d at p. 640.)

We might add that here there indeed was evidence plaintiff rider had been contributorily negligent. She took her hands off the reins for a moment to unselfishly remove her coat to hand to a co-rider, a young girl, who was complaining of the cold. But this act of contributory negligence is immaterial as the Supreme Court has taught us in *Jewett*. Consequently, we are unwilling and do not impose on purveyors of horse rides a duty when a horse "acts" as a horse, any more than we would impose a general duty on commercial small boat operators when a wave suddenly moves a boat causing a passenger to be unbalanced and injured.

We find that the trial court was correct in concluding the action brought by the Harrolds was barred by primary assumption of the risk.

### Disposition

The judgment is affirmed. Respondents to recover their costs on appeal.

Lillie, P. J., concurred.

**JOHNSON, J.**—I respectfully dissent once again from a post-*Jewett* assumption of the risk opinion authored by one of my colleagues. This time, however, the distance between our positions is far narrower and thus this dissent can be much shorter.

I have no quarrel with the majority's excellent summary of the primary assumption of the risk doctrine as it applies to operators of commercial sports facilities, including horse-renting stables. I agree such facilities owe a duty not to increase the risk above the level inherent in the athletic activity they are being compensated to supply the public. As the majority holds, in the context of a horse-renting stable this duty ordinarily includes the responsibility "to supply horses which are not unduly dangerous. . . . [and] to warn . . . patrons renting a given horse if that horse has evidenced a predisposition to behave in ways which add to the ordinary risk of horse riding." (Maj. opn., *ante*, at p. 587.)

Now, I concede it is possible to imagine a horse-renting facility catering to experienced riders and advertising the fact its stable is full of wild and dangerous horses just waiting to challenge the abilities of the best wranglers and equestrians. Presumably the commercial operator of such a horse-renting facility would not owe a duty to weed out the dangerous animals or to warn its highly experienced patrons about those dangerous propensities. But that is not the nature of the Rolling J operation. An afternoon trail ride is about as far as one can get from the sort of bronco riding adventure I have posited.

Therefore, the nature and level of duty owed by the operator of the horse-renting facility in this case is different and higher than it might be for one advertising a wild and woolly ride on untamed beasts.

Public policy certainly supports imposing a duty on commercial operators of horse-renting facilities which are catering to supervised trail riders to supply suitable horses and to warn of any unsuitably risky propensity a given horse may exhibit. Trail rides will not be *less* pleasureful because the ride takes place on safe horses or at least on ones that have not exhibited unsuitably risky tendencies. Nor does it make the ride *more* enjoyable to take it on a horse of whose propensities the operator has not bothered to warn the rider. (In contrast, the Supreme Court justified the absence of a duty of care among coparticipants in a touch football game by emphasizing imposition of such a duty would seriously impair the vigor, enthusiasm and pleasure of engaging in this particular sport. (*Knight* v. *Jewett* (1992) 3 Cal.4th 296, 318-319 [11 Cal.Rptr.2d 2, 834 P.2d 696].)

There is no more social value in sending amateur, often inexperienced, riders on a trail ride with horses known to have unsuitable propensities or with unsuitable propensities not even brought to the riders' attention than there is in sending people onto the freeways with defectively designed or manufactured cars, or putting them on a dangerously maintained ferris wheel, or sending them out into the Pacific in a rented sailboat which turns out to have torn sails, a broken rudder, and a hole in the bottom.

"Primary assumption of the risk" does not apply properly to bar recovery completely in any case where, as here, the human endeavor involved is one in which society is best served by requiring the class of which the defendant is a member to exercise due care to those in the plaintiff's class. In those situations, as explained in the plurality opinion in *Jewett*, the comparative negligence doctrine is the far superior approach in both theory and practice. It supplies a means for weighing how much of the plaintiff's injury is attributable to the commercial recreation facility's breach of its duty of due care toward its patrons and how much is attributable to the patron's breach of her duty of due care toward herself.

Here there indeed was evidence the plaintiff rider had been contributorily negligent. She took her hands off the reins for a moment to remove her coat to hand to a co-rider, a young girl, who was complaining of the cold. This act of contributory negligence, if proved at trial, presumably would find its way into the comparative negligence equation if the jury were to begin deliberating on this case. But, if proved at trial, so would Rolling J's negligence in supplying plaintiff with a horse known to have a predisposition to spook at such movements without even warning her of this predisposition. Out of this would emerge an award which not only measured out

the proper ration of compensation to the injured rider but also administered the proper levels of financial incentives to encourage safer behavior by both commercial horse riding facilities and those who rent from them.

The majority opinion, however, does not allow this case to reach the jury so that body can balance the rider's alleged contributory negligence against the commercial stable's alleged negligence and emerge with a verdict based on comparative negligence principles. That opinion concludes horse-renting facilities do not owe a duty to supply "ideal" horses, a statement with which I agree. Yet earlier in this same opinion the majority holds horse-renting facilities do owe a duty to supply horses which are not dangerous and to warn of the dangerous propensities of the horses they supply, a statement with which I also agree. The question is whether the majority is correct in determining there was not even a triable issue whether this horse had propensities of which Ms. Harrold, the rider, should have been warned.

I am convinced the plaintiffs' uncontroverted allegations this horse possessed "[an] unstable temperament . . . and/or tendency to throw riders" and that Rolling J had or should have had knowledge of this dangerous disposition (see maj. opn., *ante*, at p. 587, fn. 2) was enough to create a triable issue. In failing to produce any evidence the horse it rented Mrs. Harrold lacked dangerous propensities Rolling J has failed to controvert this material allegation of the complaint. For summary judgment purposes, the allegation must be accepted as true. (*Brown* v. *Bleiberg* (1982) 32 Cal.3d 426, 438 [186 Cal.Rptr. 228, 651 P.2d 815]; *Witchell* v. *De Korne* (1986) 179 Cal.App.3d 965, 976-977 [225 Cal.Rptr. 176]; *Pena* v. *W. H. Douthitt Steel & Supply Co.* (1986) 179 Cal.App.3d 924, 929-930 [225 Cal.Rptr. 76].)[1] If we accept as true the claim this horse had an unstable temperament and/or a tendency to throw riders it is difficult to comprehend how Rolling J's behavior failed to constitute a breach of the duty it owed Mrs. Harrold. In supplying her a horse with these traits the riding stable at a minimum had a duty to warn her of the horse's dangerous propensities.

In addition to the uncontroverted allegations in the Harrolds' complaint, which were enough by themselves to create a triable issue, there was

---

[1]The summary judgment statute, Code of Civil Procedure section 437c, was amended in 1992 effective January 1, 1993, to include a new subdivision (n). At least one commentator appears to argue this new provision may require plaintiffs who are opposing a defendant's summary judgment to introduce evidence in support of their allegations even if the defendant has not introduced evidence controverting those allegations. (Schmalz, *Summary Judgment: A Dress Rehearsal for Trial* (Sept. 1993) 16 L.A. Lawyer 23.) It would require an in-depth inquiry into the legislative history of the 1992 amendments to 437c before one could accept or reject this interpretation of the ambiguous language of subdivision (n). But there is no reason to consider the effect of 437c, subdivision (n) since this appeal is governed by the summary judgment standard in effect when this motion was decided several years ago.

evidence in the record the horse had bucked a rider a short time before Ms. Harrold's fateful ride and under circumstances almost identical to those which led to her fall.

Under California law, it was not necessary for the Harrolds to raise a triable issue this particular horse was vicious or dangerous to all riders nor that Rolling J possessed *actual* knowledge of the horse's nature. It was enough there be a triable issue the horse was unsuitable for the purpose of trail rides by amateur riders and the stable had not taken reasonable care to ascertain this fact. As our Supreme Court has held more than once, "[I]n a contract of hiring of a horse for riding purposes, . . . there is contained an implied warranty to the rider that the stablekeeper knows or has *exercised reasonable care to ascertain the habits* of the horse and that the animal is *safe and suitable for the purpose* for which the keeper hires the horse to the renter thereof." (*Kersten* v. *Young* (1942) 52 Cal.App.2d 1, 6 [125 P.2d 501], italics added; *Palmquist* v. *Mercer* (1954) 43 Cal.2d 92, 99 [272 P.2d 26], citing *Dam* v. *Lake Aliso Riding School* (1936) 6 Cal.2d 395, 399-400 [57 P.2d 1315], italics added.) This general duty is accepted in most jurisdictions. (See Annot., Liability of Owner or Bailor of Horse for Injury by Horse to Hirer or Bailee Thereof (1981) 6 A.L.R.4th 358.)

Consistent with this view, a California appellate court reversed a defense jury verdict because the instructions implied the horse a stable rents must be vicious or mean or untrustworthy in order to violate the duty owed the rider. "That instruction would tend to cause the jury to believe that plaintiff could not prevail unless the horse was vicious. In this respect it was erroneous. The jury could have found that the defendant agreed to furnish a horse that was gentle and easy to handle and that Bull Dog was not such a horse even though he was not mean or vicious or untrustworthy." (*Estes* v. *Smith* (1955) 132 Cal.App.2d 529, 535 [282 P.2d 534].)

This raises a series of questions.

How many riders does a horse get to throw before the animal is deemed to be an inappropriate mount for amateurs taking an afternoon trail ride?

And how many such bucking incidents does it take before the horse's commercial owner has a duty to warn the unlucky amateur rider about the horse's proclivities?

And finally, and of special relevance to a summary judgment motion, how many unlucky riders does a plaintiff have to produce at the summary judgment stage to create a *triable issue* the horse possesses a disposition

which is incompatible with service on trail rides or at a minimum requires the chosen riders be warned? Isn't there at least a triable issue that a horse who has spooked and bucked off at least one rider is unsuitable for this purpose?

In this case, moreover, there is more than one instance in the record evidencing this horse's predisposition to spook and throw riders. There is evidence this horse bucked off *two* riders in a rather short time span—Ms. Harrold as well as the earlier rider. Don't these two incidents support an inference the horse had a preexisting *predisposition* to spook, of which Ms. Harrold and other riders should have been warned? True, the inference of this preexisting predisposition would be stronger if the Harrolds had produced evidence this horse had thrown a dozen riders. But I am not sure a horse has to leave injured riders strewn across the landscape before we can say a *triable issue* has been created on the question of the animal's unreliability as a mount for peaceful afternoon trail rides. In my opinion, it does not require such a high degree of proof on this question to survive a summary judgment motion.

Other jurisdictions have found a single prior incident was sufficient to create a jury question as to whether the horse owner violated its duty toward those who later rented or used that horse. (*Hahn* v. *Rockingham Riding Stables* (1941) 126 N.J.L. 324 [19 A.2d 191] [nonsuit reversed where plaintiff introduced some evidence horse had suffered a fall under a previous rider before throwing plaintiff even though stable owner denied the previous incident occurred]; *Heald* v. *Cox* (Mo.Ct.App. 1972) 480 S.W.2d 107 [one prior bucking incident sufficient to support jury verdict defendant violated duty of care toward rider in failing to warn, etc. even though rider was not thrown off the horse in that prior incident and despite fact defendant was only a social host allowing guest to ride the horse and was not a commercial stable]; see also *Westberry* v. *Blackwell* (1978) 282 Ore. 129 [577 P.2d 75, 76] [nonsuit reversed in dog bite case because one prior bite, though not "conclusive" evidence of dangerous propensities, "could reasonably lead a jury to believe that the dog had dangerous propensities, and that the defendants had knowledge of them"].)

Still other states have found sufficient evidence to reach the jury even without proof of a prior incident. "The contention that there was no evidence to take the case to the jury cannot be upheld. It is based on the idea that the plaintiff was thrown by the horse's bucking, and it was never known to buck before, and that as a dog, before the statutory enactments changing the common-law rule as to scienter was entitled to its first bite, a horse is entitled to its first buck. We cannot agree to this proposition as applied to a

horse let out by a liveryman for hire." (*Vaningan* v. *Mueller* (1932) 208 Wis. 527 [243 N.W. 419, 420, 421] [jury verdict sustained for violating implicit warranty that horse is suitable for purpose for which rented when horse bucked and threw amateur rider despite lack of evidence the horse had previously bucked]; *Dolezal* v. *Carbrey* (1989) 161 Ariz. 365 [778 P.2d 1261] [summary judgment reversed where previously peaceful horse bolted when rider with only two or three previous rides attempted to dismount]; *Mateas* v. *Harvey* (9th Cir. 1945) 146 F.2d 989, 992 [quotes *Vaningan* to effect horse—in this case a mule—does not get a "free buck"].)

It would not seem it should require a greater quantum of evidence to survive a summary judgment motion in California than it takes to survive nonsuit in New Jersey or to sustain a jury verdict in Missouri. A single bucking incident was enough to reach the jury in those states and should be here. Nor should it require more evidence here than it does in the Ninth Circuit or in Arizona or Wisconsin, which do not require proof of any prior incidents.

Not surprisingly, California indeed is in line with these other jurisdictions on this issue. In *Dorobek* v. *Ride-A-While Stables* (1968) 262 Cal.App.2d 554 [68 Cal.Rptr. 774], the Court of Appeal held riders need not introduce evidence of any prior incidents of injury or misbehavior by the horse in order to recover from the stable for the injuries they sustained.

In that case, the jury returned a verdict in favor of a rider who had been thrown from her rented horse. On appeal, the defendant stable complained the evidence was insufficient to show it violated its duty to ascertain the horse would be unmanageable or dangerous. The stable pointed to the absence of evidence in the record of any prior incidents where this horse had misbehaved or harmed a rider. Moreover, both the stable owner and an employee testified the horse was gentle, had no bad traits, and never bucked or been the subject of complaints by previous riders. None of this evidence about the horse's prior history was controverted directly. The plaintiff rider instead relied on two facts: (1) the spirited behavior of the horse during the incident which injured her, and (2) the failure of the stable's records to reflect reports of riders' complaints about any horses they rented while conceding such reports had been made about some horses (but not the one involved in this incident).

The appellate court affirmed the jury verdict in favor of the plaintiff rider. It concluded the horse's behavior on the single occasion in which plaintiff was injured represented ample proof the horse possessed dangerous characteristics. "Certainly if an expert horseman can tell if a horse has dangerous

characteristics by proper observation of the horse, defendant's failure to make such observation was negligence, and there was *no necessity for plaintiff to establish prior acts of the horse* and knowledge thereof by defendant." (*Dorobek* v. *Ride-A-While Stables, supra,* 262 Cal.App.2d at p. 561, italics added.)

. In *Estes* v. *Smith, supra,* 132 Cal.App.2d 529, the court did not squarely address the question of the sufficiency of the plaintiff rider's evidence. The court, however, did reverse a jury verdict which had been rendered in defendant's favor because of instructional error despite the fact plaintiff had only introduced evidence of a *single* prior incident of misbehavior by the horse who threw him. If the *Estes* court considered more was required, presumably it would not have bothered to return the case for retrial. And, if one prior incident is enough to support a jury verdict in favor of a rider, it certainly is enough to survive a summary judgment motion.

In sum, I am convinced a triable issue exists for two reasons. First, Rolling J failed to controvert the Harrolds' allegations this horse was dangerous and threw riders. Alternatively, under California and out-of-state authorities, evidence the Harrolds pointed to in the record was sufficient to create a triable issue not merely that this horse was less than "ideal" but that it possessed a disposition which made it unsuitable for amateur trail riders. The majority opinion itself holds Rolling J owed a duty not to increase the risk above that inherent in the sport of trail riding. There was a triable issue the riding stable violated this duty by supplying Ms. Harrold with this horse and also failing to warn her of its unsuitable tendencies. Accordingly, in my opinion, the summary judgment should be reversed.