[No. C047061. Third Dist. Jan. 24, 2006.]

TERI LACKNER, Plaintiff and Appellant, v.
CASSIDY BODINE NORTH et al., Defendants and Respondents.

1190

## COUNSEL

Sands & Associates, Leonard S. Sands, Heleni E. Suydam, Tracy Neal-Lopez; Costa, Abrams & Coate and Charles M. Coate for Plaintiff and Appellant.

Martin S. McHugh; Halkides, Morgan & Kelley, John P. Kelley; Tucker Ellis & West, Peter J. Koenig and Brian T. Clark for Defendants and Respondents.

## Opinion

**BLEASE, Acting P. J.**—Plaintiff Teri Lackner (Lackner) appeals from the summary judgment entered in favor of defendants Cassidy Bodine North (North), a member of the Chico High School Ski and Snowboard Team, Darryl Bender (Bender) who was North's coach, Chico Unified School District (Chico), Oroville Union High School District (Oroville), and Mammoth Mountain Ski Area (Mammoth).

Lackner brought this action to recover for personal injuries sustained at Mammoth while she was standing in a largely deserted area at the base of an advance run used by skiers and snowboarders to stop and rest. As Lackner was conversing with her husband, North, who had just sped down the run on his snowboard, headed directly towards her at a high rate of speed and crashed into her, causing her severe injuries.

The trial court granted defendants summary judgment finding, inter alia, that primary assumption of the risk bars their liability to plaintiff and that punitive damages are not recoverable against North.

On appeal, Lackner contends the trial court erred by granting North's motion for joinder, summary judgment, and summary adjudication because his motions were untimely and triable issues of fact remain as to whether his conduct was reckless and whether he acted with malice warranting punitive damages. Lackner also contends the trial court erred in granting the remaining motions for summary judgment because primary assumption of the risk is inapplicable to the other defendants, and Chico and Bender are not immune from liability under Government Code section 831.7.

We find there are triable issues of fact on the question whether North's conduct was reckless. We shall therefore reverse the judgment in favor of North. Because Lackner does not raise any claim of error as to Oroville, we shall dismiss that portion of her appeal. We shall affirm the judgments in all other respects.

### FACTUAL AND PROCEDURAL BACKGROUND[1]

*The Parties*

Mammoth hosted the California Nevada Ski and Snowboard Federation State High School Championships (championships) from March 3, 2002,

---

[1] On an appeal from summary judgment, we set forth the undisputed facts and those facts alleged by plaintiff, which are supported by the evidence properly considered by the trial court, and the reasonable inferences that may be drawn from the evidence. (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 67 [105 Cal.Rptr.2d 652].)

through March 7, 2002. The event brought approximately 400 high school participants. Race participants were supposed to train for their respective events on the training courses designated for their event, although Mammoth granted the participants unrestricted access to the entire mountain for free skiing and snowboarding.

North, an 18-year-old senior at Chico High School and a member of the Chico High School Ski and Snowboard Team (team), was a participant in the snowboarding championship. He was ranked in the top three on his team and was entered in the slalom and giant slalom events. This was his first visit to Mammoth. Bender was employed by Chico as the head coach of the team and accompanied the team to the championship.

Lackner and her husband were skiing at Mammoth on Sunday, March 3, 2002. Lackner was an expert skier who had been skiing for 31 years and had skied at Mammoth over 100 times. No public announcement was made about the championship and the Lackners were unaware training activities were taking place that day.

Sunday, March 3d was designated as a training day for the championship participants. At approximately 8:30 a.m., Bender told the team to "go up and take several warm up runs, take it slow and easy and report down to the top of Terry and Fascination," where the actual race courses began.

The team took a gondola to the top of the mountain. North and three team members decided to begin their warmup by riding their snowboards down Cornice Bowl, which was not one of the designated training runs. The foursome chose this run because it was the highest one on the mountain and they wanted to "check out Mammoth from the top" and have some fun. North had never been down Cornice Bowl before.

Cornice Bowl is a very steep run for advanced skiers. The bottom of the run flattens out into a natural gathering area, which leads to two other runs and a precipice referred to as Hair Jump. While the flat area of Cornice Bowl is not marked as an official rest stop, skiers and snowboarders frequently gather there to rest and regroup before continuing their descent to the bottom of the ski area where the ski lifts are located.

North and Tyler Frank began their descent about the same time, but North took the lead, coming down the run extremely fast and in a controlled tuck position. He appeared to be racing his other teammates, looking back more than once to see where the others were positioned, noting that Frank was close behind him.

Meanwhile, Lackner and her husband had just completed a run down Cornice Bowl, which Lackner had been down several hundred times. Her

husband completed the run ahead of her and was waiting for her in the flat area to the side of the run just above Hair Jump. When Lackner reached the bottom, she traversed over to her husband and was standing there talking to him when North collided with her. At that time, she was facing away from the run and did not see North until he hit her. There was plenty of open space around her and the visibility on the mountain was clear. There were no obstacles between the Lackners and someone descending Cornice Bowl.

North did not see Lackner until he was about 10 to 15 feet away from her. At that time he attempted to swerve, lost control,[2] and crashed into her, catapulting the two of them 50 feet into the air. The force was so great that Lackner's husband heard her bones crush. North and Lackner slid down the mountain together, coming to rest in a gully at the bottom of Hair Jump.

North was not injured. Lackner on the other hand, suffered severe injuries. The impact shattered her ankle and broke her lower leg into 16 pieces. Her right tibia and pelvis were fractured, the muscles and tendons in her thigh were torn, and she was bruised throughout her body. The surgeon who operated on her equated her bone fractures with those suffered in a car or motorcycle accident.

Mammoth revoked North's lift ticket pursuant to its policy to revoke a lift ticket when a skier or snowboarder engages in reckless conduct or fast skiing, or collides with another skier. North was also suspended from the championship.

Lackner filed suit against North, Bender, Chico, Oroville, and Mammoth to recover damages for personal injuries. She alleged negligence and battery against North and sought punitive damages from him. She alleged that Bender, Chico, and Oroville negligently supervised North, and that Mammoth negligently supervised the sports premises.

Mammoth, Bender, Chico, and Oroville moved for summary judgment. North moved to join their motions and filed a separate statement of undisputed facts and a separate motion for summary adjudication of the punitive damages claim. The court granted all motions finding the primary assumption of the risk bars liability against all named defendants. Additionally, the court found Bender, Chico, and Oroville were immune from liability (Gov. Code, § 831.7) and did not owe Lackner a duty of care because North had no known propensity to ski recklessly or out of control and he was an adult. Additionally, the court found no factual basis to show Oroville was associated with or responsible for the team, North, or Bender.

---

[2] When North noticed Lackner, he made a very aggressive sideways turn with his snowboard in an effort to slow down.

Judgment was entered in favor of all defendants and Lackner appeals from the judgment as to each defendant.[3]

## DISCUSSION

## I

## Standard of Review

The standard of review for summary judgment is well established. The motion "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) A moving defendant has met his burden of showing that a cause of action has no merit by establishing that one or more elements of a cause of action cannot be established or that there is a complete defense. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849–850 [107 Cal.Rptr.2d 841, 24 P.3d 493].)

We independently review an order granting summary judgment, viewing the evidence in the light most favorable to the nonmoving party. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768 [107 Cal.Rptr.2d 617, 23 P.3d 1143]; *Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1001 [67 Cal.Rptr.2d 483].) In performing our independent review of the evidence, "we apply the same three-step analysis as the trial court. First, we identify the issues framed by the pleadings. Next, we determine whether the moving party has established facts justifying judgment in its favor. Finally, if the moving party has carried its initial burden, we decide whether the opposing party has demonstrated the existence of a triable, material fact issue." (*Chavez v. Carpenter* (2001) 91 Cal.App.4th 1433, 1438 [111 Cal.Rptr.2d 534].)

In determining whether there is a triable issue of material fact, we consider all the evidence set forth by the parties except that to which objections have been made and properly sustained. (Code Civ. Proc., § 437c, subd. (c); *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 [100 Cal.Rptr.2d 352, 8 P.3d 1089].) We accept as true the facts supported by plaintiff's evidence and the reasonable inferences therefrom (*Sada v. Robert F. Kennedy Medical Center* (1997) 56 Cal.App.4th 138, 148 [65 Cal.Rptr.2d 112]), resolving evidentiary doubts or ambiguities in plaintiff's favor. (*Saelzler v. Advanced Group 400, supra,* 25 Cal.4th at p. 768.)

---

[3] Although Lackner filed a notice of appeal from the judgment in favor of Oroville, she has failed to raise any claim of error relating to the judgment against Oroville and Oroville has not filed or joined a respondent's brief. We shall therefore dismiss her appeal with respect to Oroville. (Cal. Rules of Court, rules 13(a)(1), 17(a)(1).)

## II

### Primary Assumption of the Risk

The operative complaint alleges that North engaged in reckless conduct totally outside the range of ordinary activity involved in snowboarding and the remaining defendants were negligent in protecting Lackner from the risk of harm that resulted in her injuries. On appeal, she contends the trial court erred in granting summary judgment against her because triable issues of fact remain as to whether defendants owed her a duty of care under the doctrine of primary assumption of the risk. Defendants contend their liability to Lackner is barred by that doctrine. We therefore turn to the general principles governing primary assumption of the risk.

### A. *General Principles of Law*

To establish a cause of action for negligence, plaintiff must prove defendants owed her a duty of care. (*Wattenbarger v. Cincinnati Reds, Inc.* (1994) 28 Cal.App.4th 746, 751 [33 Cal.Rptr.2d 732].) The general rule of duty is that each person has a duty to use due care to avoid injuring others by his or her careless conduct (Civ. Code, § 1714; *Knight v. Jewett* (1992) 3 Cal.4th 296, 315 [11 Cal.Rptr.2d 2, 834 P.2d 696] (*Knight*)) and the duty owed by a property owner is to use due care to eliminate dangerous conditions on his or her property. (*Rowland v. Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561].) Any exception to the general rule must be based on a clear public policy or statute. (*Id.* at p. 112; *Knight, supra,* 3 Cal.4th at p. 315.) The doctrine of primary assumption of the risk is one such exception. (*Hamilton v. Martinelli & Associates* (2003) 110 Cal.App.4th 1012, 1021 [2 Cal.Rptr.3d 168].)

With respect to that doctrine, the court in *Knight, supra,* 3 Cal.4th at pages 314–315[4] explained that "by virtue of the nature of the activity and the parties' relationship to the activity, the defendant owes no legal duty to protect the plaintiff from the particular risk of harm that caused the injury—the doctrine . . . operate[s] as a complete bar to the plaintiff's recovery." The court made clear that the question whether the defendant owes a legal duty to protect the plaintiff from a particular risk of harm does not depend on the reasonableness or unreasonableness of the plaintiff's action or on the plaintiff's

---

[4] The lead opinion in *Knight* is a three-justice plurality opinion; three justices concurred and dissented, and one justice dissented. (*Knight, supra,* 3 Cal.4th at pp. 321, 324.) The principles announced however, have been restated as the controlling law on primary assumption of the risk. (*Cheong v. Antablin* (1997) 16 Cal.4th 1063, 1067 [68 Cal.Rptr.2d 859, 946 P.2d 817]; *Neighbarger v. Irwin Industries, Inc.* (1994) 8 Cal.4th 532, 537–538 [34 Cal.Rptr.2d 630, 882 P.2d 347].)

subjective knowledge of the specific risk of harm posed by the defendant's conduct. (*Knight, supra,* 3 Cal.4th at p. 315.) Rather, it turns on the nature of the sport and the defendant's role in or relationship to the sport. (*Id.* at pp. 315, 317.)

■ In *Knight,* the plaintiff sued for injuries sustained in an informal game of touch football when one of the other players collided with her and stepped on her hand. The court held that the game of touch football comes within the primary assumption of the risk doctrine because the risk of colliding with another player resulting in injury is inherent in the game. The court noted that in the active sports setting, conditions or conduct that might otherwise be viewed as dangerous are often an integral part of the sport. Although a defendant has no legal duty to eliminate or protect a plaintiff against risks inherent in the sport, the defendant owes a duty of due care not to increase the risks inherent in the sport. (*Knight, supra,* 3 Cal.4th at pp. 315–316.) ■ For example, while a ski resort has no duty to eliminate moguls because they are part of the sport of skiing, it has "a duty to use due care to maintain its towropes in a safe, working condition so as not to expose skiers to an increased risk of harm." (*Knight, supra,* 3 Cal.4th at p. 316.)

■ The duty of care owed by participants in an active sport is to avoid intentionally injuring another participant or engaging in reckless conduct totally outside the range of the ordinary activity in the sport. (*Knight, supra,* 3 Cal.4th at pp. 318, 320.) The court in *Knight* noted that "in the heat of an active sporting event . . . a participant's normal energetic conduct often includes accidentally careless behavior." (*Knight, supra,* 3 Cal.4th at p. 318.) As a result, careless conduct is treated as an "inherent risk" of the sport. (*Id.* at p. 316.) The primary policy consideration of this limited duty of care is to avoid discouraging vigorous participation and fundamentally altering the nature of the sport. (*Knight, supra,* 3 Cal.4th at pp. 318–319; *Kahn v. East Side Union High Sch. Dist.* (2003) 31 Cal.4th 990, 1004 [4 Cal.Rptr.3d 103, 75 P.3d 30].)

■ Because the duty owed by a coparticipant under primary assumption of the risk is not necessarily the same as that owed by a resort owner, a coach, or a school district (*Knight, supra,* 3 Cal.4th at pp. 317–318; *Galardi v. Seahorse Riding Club* (1993) 16 Cal.App.4th 817, 822 [20 Cal.Rptr.2d 270]; *Ratcliff v. San Diego Baseball Club* (1938) 27 Cal.App.2d 733, 736 [81 P.2d 625]), we separately examine Lackner's claim as to each defendant.

B. *North*

With sparse argument and little citation of authority, North contends he is not liable to Lackner because he was only snowboarding down an advanced run at a fast but controlled rate of speed, which does not constitute reckless or

intentional conduct. We disagree and find there is a triable issue of fact as to whether North's conduct was reckless.

As stated, North is liable to Lackner if he intentionally injured her or engaged in reckless conduct totally outside the range of the ordinary activity in the sport, so that a prohibition of the conduct would not deter vigorous participation or fundamentally alter the nature of the sport. (*Knight, supra*, 3 Cal.4th at pp. 318, 320; *Freeman v. Hale* (1994) 30 Cal.App.4th 1388, 1394 [36 Cal.Rptr.2d 418]; *Bush v. Parents Without Partners* (1993) 17 Cal.App.4th 322, 329 [21 Cal.Rptr.2d 178].)

Primary assumption of the risk has been applied to a variety of active sports—contact (*Knight, supra*, 3 Cal.4th 296) and noncontact sports alike—(*Ford v. Gouin* (1992) 3 Cal.4th 339, 345 [11 Cal.Rptr.2d 30, 834 P.2d 724]), including football, baseball, hockey, ice-skating, snow skiing, and snowboarding, to name a few. (See cases collected in *Moser v. Ratinoff* (2003) 105 Cal.App.4th 1211, 1220 [130 Cal.Rptr.2d 198].) Under primary assumption of the risk, an injured plaintiff was barred from recovering from a coparticipant after being hit by a carelessly thrown baseball (*Ratcliff v. San Diego Baseball Club, supra*, 27 Cal.App.2d at p. 736; *Mann v. Nutrilite, Inc.* (1955) 136 Cal.App.2d 729, 734–735 [289 P.2d 282]), a carelessly extended elbow during a basketball game (*Knight, supra*, 3 Cal.4th at p. 316, citing *Thomas v. Barlow* (1927) 5 N.J. Misc. 764 [138 A. 208]), and a swinging sail during a course change. (*Stimson v. Carlson* (1992) 11 Cal.App.4th 1201 [14 Cal.Rptr.2d 670].)

Inadvertent collisions with coparticipants who carelessly cross paths are an inherent risk of many sports. (*Cheong v. Antablin, supra*, 16 Cal.4th at pp. 1069–1070 [skiers]; *Mastro v. Petrick* (2001) 93 Cal.App.4th 83, 90 [112 Cal.Rptr.2d 185] [snowboarder and skier]; *Moser v. Ratinoff, supra*, 105 Cal.App.4th at p. 1219 [bicycle racers]; *Distefano v. Forester* (2001) 85 Cal.App.4th 1249, 1261 [102 Cal.Rptr.2d 813] [off-road motorcyclists]; *Staten v. Superior Court* (1996) 45 Cal.App.4th 1628 [53 Cal.Rptr.2d 657] [iceskaters].)

Not all conduct engaged in during an active sport is excused under the doctrine, however. Thus, primary assumption of the risk was not applied to bar the liability of a discus thrower who threw a discus into a playing field before determining that the target area was clear of another participant and warning her that he was about to throw. (*Yancey v. Superior Court* (1994) 28 Cal.App.4th 558, 566 [33 Cal.Rptr.2d 777].) In *Yancey*, the plaintiff was still on the playing field retrieving her own discus when her classmate, who was throwing next, threw his discus, which struck her in the head. In reversing summary judgment, the court found that unlike football or baseball, discus

throwing is not a contact sport that requires that a ball or other article be propelled towards other participants. "Nothing about the inherent nature of the sport requires that one participant who has completed a throw and is retrieving his or her discus should expect the next participant to throw without looking toward the landing area." (*Ibid.*, fn. omitted.)

 In North's view, this was a garden-variety collision, the type inherent in the sport. We disagree. According to section 500 of the Restatement Second of Torts, one acts with reckless disregard for the safety of another if the actor "does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent." Comment a to that section describes two types of reckless conduct. In both types, the actor knows or has reason to know of facts which create a high degree of risk of physical harm to another and deliberately proceeds to act or fail to act. However, in one type the actor proceeds "in conscious disregard of, or indifference to, that risk. In the other the actor . . . does not realize or appreciate the high degree of risk involved, although a reasonable man in his position would do so. An objective standard is applied to him, and he is held to the realization of the aggravated risk which a reasonable man in his place would have, although he does not himself have it." (Rest.2d Torts § 500, com. a, at pp. 587–588.)

North was an accomplished skier and advanced snowboarder who came to Mammoth to participate in an interscholastic snowboarding championship. Consistent with the "Skier's Responsibility Code," he was taught that skiing is a dangerous sport, so he should stay in control, to give downhill skiers the right of way, to beware of skiers from above whenever merging or traversing, and to observe all signs and warnings. Safety was always stressed. He was therefore aware that he was supposed to be looking for skiers downhill of him, as Lackner was, and knew that colliding with another skier or snowboarder while going at a high rate of speed carries a high degree of risk of serious physical injury.

On the morning of the collision, he and his three teammates decided to go down Cornice Bowl, a run that North had never been down before and that was not a designated training run. He took the lead and came down the run at an extremely fast pace, maintaining a controlled race position, while looking back more than once to check the position of his teammates.

Meanwhile, Lackner had just completed her run down the Cornice and had traversed over to her husband, who was standing to the left of the run in a flat

area used by snowboarders and skiers to rest and regroup before taking off on a connecting run. Visibility was good and there was nothing blocking North's view of Lackner. Lackner was at a virtual standstill and conversing with her husband while North rode directly towards her with increasing speed, making no effort to alter his course until he was too close to avoid hitting her. The fact Lackner's husband heard her bones being crushed, and her massive injuries, is evidence of the tremendous force of the impact and the speed North was traveling when he hit her.

Under these circumstances, there is a triable issue of fact as to whether or not the collision was inadvertent and unavoidable because North lost control of his snowboard as a result of a risk inherent in snowboarding. Lackner's evidence shows that the collision occurred because North was racing his teammates and was preoccupied with his position. As a result, he rode his snowboard into a rest area at a high rate of speed without looking where he was heading and despite the fact he was unfamiliar with the terrain and the ski area in general. However, visibility was excellent and the area was wide open. Had he been paying attention to his surroundings and the few people standing in the area, he had the skill, and would have had the time and the space to avoid hitting Lackner.

While racing down an advanced run is part of the thrill of snowboarding, intentionally speeding into a flat area at the base of an advanced run where people have stopped to rest, when one is unfamiliar with the area, without looking where one is going is not an integral and unavoidable part of the sport. North's conduct is analogous to a freeway driver who exits the freeway without slowing down or looking for other cars that are also exiting. As a result, he crashes into one that has stopped and is waiting to turn onto a connecting street. Lackner has therefore raised a triable issue of material fact as to whether North was reckless.

### C. *Mammoth*

Lackner contends Mammoth breached its duty of care by creating a dangerous and defective condition that increased the risks inherent in skiing. It did this by failing to enforce and supervise the race participants' use of ordinary ski runs and by failing to warn its patrons that race participants were permitted to train on ordinary ski runs.[5]

---

[5] For the first time on appeal, Lackner argues that Mammoth failed to properly post signs in the area where the incident occurred, warning that the area is a rest stop where slowing should occur. Mammoth does not respond to this argument and we decline to address it because Lackner's complaint does not allege that Mammoth failed to post warning signs in the area of the collision. Her supplemental statement of undisputed facts sets forth facts that Mammoth failed to post warning signs in the area of the collision where it generally posted such signs.

In her complaint, Lackner alleged that Mammoth negligently operated, maintained, and controlled the slopes so as to create a dangerous condition. It did so by permitting race participants to practice on runs not designated for training or racing, failing to warn its other patrons that participants were authorized to train on ordinary runs, and failing to take other precautions for the safety of persons using the slope.

Mammoth argues that because it has no duty to eliminate or protect Lackner from a collision with a snowboarder, it did not owe her a duty to supervise racing participants such as North or to warn of their use of the slopes. We agree with Mammoth.

### 1. *Duty to Supervise Race Participants*

As stated, defendant has no legal duty to eliminate or protect a plaintiff against risks inherent in the sport. A defendant does have a duty to use due care not to increase the risks to a participant over and above those inherent in the sport. (*Knight, supra*, 3 Cal.4th at pp. 315–316; *Solis v. Kirkwood Resort Co.* (2001) 94 Cal.App.4th 354, 364–365 [114 Cal.Rptr.2d 265].)

The risks inherent in snow skiing have been well catalogued and recognized by the courts. Those risks include injuries from variations in terrain, surface or subsurface snow or ice conditions, moguls, bare spots, rocks, trees, and other forms of natural growth or debris. They also include collisions with other skiers, ski lift towers, and other properly marked or plainly visible objects and equipment. (*Danieley v. Goldmine Ski Associates, Inc.* (1990) 218 Cal.App.3d 111, 123 [266 Cal.Rptr. 749]; *Connelly v. Mammoth Mountain Ski Area* (1995) 39 Cal.App.4th 8, 12 [45 Cal.Rptr.2d 855]; *O'Donoghue v. Bear Mountain Ski Resort* (1994) 30 Cal.App.4th 188, 193 [35 Cal.Rptr.2d 467].) *As a downhill snow sport, snowboarding shares these same risks.*

 Owners and operators of recreational resorts and facilities also have a duty to warn their patrons of dangerous conditions the owner is aware of, but are not apparent to the patron. (*Solis v. Kirkwood Resort Co., supra*, 94 Cal.App.4th at p. 366; *Harrold v. Rolling J. Ranch* (1993) 19 Cal.App.4th 578, 588 [23 Cal.Rptr.2d 671] [operator of riding stable has a duty to warn patron if a horse has evidenced a predisposition to behave in ways that add to the ordinary risk of riding].)

---

However, the pleadings "delimit the scope of the issues" to be determined and "[t]he complaint measures the materiality of the facts tendered in a defendant's challenge to the plaintiff's cause of action." (*FPI Development, Inc. v. Nakashima* (1991) 231 Cal.App.3d 367, 381 [282 Cal.Rptr. 508].) Lackner's separate statement of material facts is not a substitute for an amendment of the complaint. (See *Couch v. San Juan Unified School Dist.* (1995) 33 Cal.App.4th 1491, 1500 [39 Cal.Rptr.2d 848].) Because Lackner's complaint fails to allege facts that give rise to a duty to post such signs, she may not assert Mammoth's breach of that duty.

Lackner cites no authority requiring a ski resort to personally supervise skiers who use their ski runs. In *Knight, supra,* 3 Cal.4th at page 317, the court cited with approval several cases involving the duty owed by a stadium owner to a spectator. In those cases, the court defined the inherent risks, by looking not only to the nature of the sport, but also "to the steps the sponsoring business entity reasonably should be obligated to take in order to minimize the risks without altering the nature of the sport." (*Ibid.; Quinn v. Recreation Park Assn.* (1935) 3 Cal.2d 725, 728–729 [46 P.2d 144] [discussing separately the potential liability of a player and a baseball stadium owner for injury to a spectator]; *Shurman v. Fresno Ice Rink* (1949) 91 Cal.App.2d 469, 474–477 [205 P.2d 77].) Thus, stadium owners have a duty to provide a certain measure of protection from errant balls by erecting screens that provide protection for a certain number of seats. (*Quinn v. Recreation Park Assn., supra,* 3 Cal.2d 725.)

However, as stated, the operator of a ski resort is not an insurer of its patron's safety and has no duty to prevent or protect a skier from inherent risks of the sport. Collisions with other skiers and snowboarders are one of those risks. Mammoth cannot be required to provide close supervision of skiers and snowboarders in order to protect other skiers from the risk of ordinary collisions. Just prior to the collision, North was lawfully snowboarding down a black diamond run, conducting himself no differently than any other expert snowboarder descending an advanced run. Because Mammoth does not prohibit racing on its advanced runs and the run was largely deserted,[6] an employee on ski patrol would have had no duty to warn him to slow down while he was descending the run itself. That he may have been reckless at the bottom of the run does not alter Mammoth's duty of care in the absence of evidence Mammoth knew or should have known North or other race participants were reckless (*Harrold v. Rolling J. Ranch, supra,* 19 Cal.App.4th at p. 588) and no such evidence was presented.[7] Moreover, because the area was largely deserted, there was no need for or duty to provide additional ski patrols at that time.

---

[6] Lackner admits in her complaint that the slope was "largely deserted" at the time of the collision. She is bound by that judicial admission. (*Valerio v. Andrew Youngquist Construction* (2002) 103 Cal.App.4th 1264, 1271 [127 Cal.Rptr.2d 436].) ·

[7] No evidence was presented showing there was a higher incidence of collisions or reckless conduct on the slopes during the championship or that there was a higher incidence of such during other competitive events hosted by Mammoth. On the other hand, it is undisputed that Mammoth has a policy of revoking the lift ticket of any participant who skis recklessly or too fast or causes a collision, and North was the only championship participant to have his ticket revoked.

## 2. *Duty to Eliminate or Warn of a Dangerous Condition*

Lackner also argues that Mammoth created a dangerous condition by hosting the championship, which brought 400 teenage skiers and snowboarders to the mountain, and allowing them to train on ordinary runs without providing additional ski patrols. This claim is based upon facts not supported by the evidence.

It is undisputed that Mammoth hosted the championship event and that there were 400 participants in that event. However, because the slope was "largely deserted" at the time of the collision and Lackner's injuries did not result from overcrowded conditions on the slope, any potential risk created by the championship in that regard cannot provide the basis for recovery.

Nor is there any evidence Mammoth allowed race participants to "train" on ordinary runs or that North was in fact training on Cornice Bowl just prior to the collision. According to Mammoth's race director, the participants could train on a race course set up in an area designated for that purpose or they could "go out and use whatever part of the mountain they would like to, but that wouldn't be considered training because . . . there is no[] . . . course set up. Everybody free skis or boards outside of the race area." The Cornice run was open to everyone and, as an advanced run, racing was not prohibited.

Moreover, Bender instructed the team to take a couple of warmup runs and meet him at the top of the training course. Thus, formal training was to take place on the designated training courses. When North and his teammates descended Cornice Bowl, their instructions were to warm up. Their own stated goal was to "have some fun." However, aggressive play and rules violations are inherent in the sport. (*Allan v. Snow Summit, Inc.* (1996) 51 Cal.App.4th 1358, 1367 [59 Cal.Rptr.2d 813].) Because there is no evidence to show that allowing race participants access to ordinary runs increased the risk of injury on the slopes and that Mammoth was aware of such increased risks, it was under no obligation to warn its patrons that race participants had free access to all of the runs.

### D. *Bender and Chico*[8]

Lackner contends genuine issues of material fact are in dispute as to whether Bender and Chico negligently supervised North because Bender

---

[8] Analytically, the question of a public entity's immunity from tort liability does not arise until it is determined that the entity owes the plaintiff a duty of care. (*Davidson v. City of Westminster* (1982) 32 Cal.3d 197, 201–202 [185 Cal.Rptr. 252, 649 P.2d 894].) Because we find that neither Bender nor Chico owed Lackner a duty of care, we do not reach the question of immunity addressed by the parties.

failed to accompany him on his warmup run. Bender and Chico contend they did not owe Lackner a duty to supervise North because he was an adult at the time of the collision and he was not under their direct supervision.[9] They also argue that under the primary assumption of the risk doctrine, they owed no duty of care to Lackner because they neither knew nor had reason to know that North had a tendency to snowboard in a reckless manner. We agree with defendants on the latter point and find that Bender and Chico had no duty to personally supervise North's warmup run.

At the time of the collision, Bender was the head coach of the team and was employed by Chico. As a public entity, Chico is not liable for injuries arising from an act or omission except as provided by statute. (Gov. Code, § 815, subd. (a); *Hoff v. Vacaville Unified School Dist.* (1998) 19 Cal.4th 925, 932 [80 Cal.Rptr.2d 811, 968 P.2d 522] (*Hoff*).) By statute, a public entity is vicariously liable for any injury caused by its employee (Gov. Code, § 815.2, subd. (a)) and an employee of a public entity is liable for his torts to the same extent as a private person. (Gov. Code, § 820, subd. (a); *Hoff, supra,* at p. 932.)

Thus, " 'a school district is vicariously liable for injuries proximately caused by [the] negligence' of school personnel 'responsible for student supervision.' " (*Hoff, supra,* 19 Cal.4th at p. 932, quoting *Dailey v. Los Angeles Unified Sch. Dist.* (1970) 2 Cal.3d 741, 747 [87 Cal.Rptr. 376, 470 P.2d 360].) Because Chico's liability is dependent upon Bender's liability, we next consider whether Bender owed Lackner a duty of care.

Under primary assumption of the risk, coaches and instructors, like owners and operators of commercial recreational activities, are not insurers of an athlete's safety. The duty owed by a coach to a student in his charge is to "use due care not to increase the risks to a participant over and above those inherent in the sport." (*Knight, supra,* 3 Cal.4th at p. 316; *Balthazor v. Little League Baseball, Inc.* (1998) 62 Cal.App.4th 47, 52 [72 Cal.Rptr.2d 337]; *Fortier v. Los Rios Community College Dist.* (1996) 45 Cal.App.4th 430, 435 [52 Cal.Rptr.2d 812].)

However, Lackner was not in Bender's charge and she has cited no authority holding that a coach's duty to his charge includes a duty to supervise the charge in order to protect a third person from injury. Nor do we find any such duty.

---

[9] We need not address this claim. Nevertheless, we note that while North was 18 years old when he collided with Lackner, he was a student of Chico High School and subject to California's compulsory education requirement, which applies to every person between the ages of six and 18 years. (Ed. Code, § 48200.)

Under the doctrine of primary assumption of the risk, Bender had no duty to protect Lackner from the inherent risk of colliding with a member of his team and there is no evidence Bender increased the risks inherent in the sport. His instructions to his team Sunday morning to take several warmup runs "slow and easy," and report to the top of the training courses[10] can hardly be said to have increased the risk of collision with other skiers and snowboarders. Nor did Bender have a duty to expressly advise the team to confine their racing activities to racing and training courses and to refrain from racing on nondesignated courses. As we have found, North was not formally racing or training on Cornice Bowl. To the extent Lackner's reference to "racing" means "speeding," an instruction to refrain from racing or speeding was implicit in Bender's instruction to "take it slow and easy."

Lackner relies on *Hoyem v. Manhattan Beach City Sch. Dist.* (1978) 22 Cal.3d 508 [150 Cal.Rptr. 1, 585 P.2d 851], *Lehmuth v. Long Beach Unified Sch. Dist.* (1960) 53 Cal.2d 544 [2 Cal.Rptr. 279, 348 P.2d 887], and *Leger v. Stockton Unified School Dist.* (1988) 202 Cal.App.3d 1448 [249 Cal.Rptr. 688] as authority that Bender had a duty to supervise North. These cases are inapposite because they do not involve a nonstudent injured by a student.

■■■ " 'As a general rule one has no duty to control the conduct of another, and no duty to warn those who may be endangered by such conduct. [Citations.] A duty may arise, however, where "(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relation exists between the actor and the other which gives the other a right to protection." (Rest.2d Torts, § 315; [citations].)' " (*Hoff, supra,* 19 Cal.4th at p. 933.)

■■■ A special relationship exists between a student and a school district that gives rise to a duty to " 'supervise at all times the conduct of the children on the school grounds and to enforce those rules and regulations necessary to their protection.' " (*Hoff, supra,* 19 Cal.4th at p. 934.) "[T]he amount of care due to minors increases with their immaturity and consequent heedlessness to danger." (*Satariano v. Sleight* (1942) 54 Cal.App.2d 278, 283 [129 P.2d 35].) " '[N]o supervision is required where the school has no reason to think any is required.' " (*Leger v. Stockton Unified School Dist., supra,* 202 Cal.App.3d at p. 1461.)

■■■ However, in *Hoff, supra,* 19 Cal.4th at page 937, the court held that a school district's duty to supervise its students does not extend to protect a nonstudent from injuries caused by a student off-campus. In so holding, the

---

[10] While Lackner asserts in her opening brief that she disputed these "allegations," the record shows she did not dispute that Bender gave the instructions as quoted.

court concluded that school officials "who neither know nor reasonably should know that a particular student has a tendency to drive recklessly owe no duty to off-campus nonstudents." (*Id.* at p. 936.)

*Hoff* is dispositive. Bender had no reason to think North required close and direct supervision of his warmup. North was an 18-year-old high school senior who was an expert snowboarder, participating in the state championships. He had no known history of collisions or reckless conduct on the slopes and was well regarded as a responsible team member. Bender never saw North engage in skiing or snowboarding activity Bender considered reckless or unsafe, nor was he aware that reckless activity took place.[11] Bender gave clear instructions to North and the rest of the team to take a couple of slow and easy warmup runs before reporting to the training course. Under these circumstances and having given these instructions, Bender had no duty to personally supervise North on his off-course warmup and cannot be faulted for failing to instruct the team to confine their racing activities to the training course.

## III

### Punitive Damages

Lackner contends her claim for punitive damages against North should be reinstated because (1) his motion for summary adjudication was untimely and (2) triable issues of fact remain on this claim. North contends his motion was timely because it was at least 75 days prior to the continued hearing date. He does not respond to the merits of Lackner's claim.

We agree with North that his motion was not untimely. We also find the trial court properly found the evidence does not support a claim for punitive damages.[12]

### A. *Timeliness*

Code of Civil Procedure section 437c, subdivision (a) requires that notice of a motion for summary judgment and the supporting papers must be "served on all other parties to the action at least 75 days before the time appointed for

---

[11] According to North, he had never collided with anybody on the slopes before colliding with Lackner, and prior to that collision, he had never been reprimanded or disciplined for skiing or snowboarding too fast or out of control.

[12] Because the judgment is presumed correct in the absence of a showing of affirmative error (Cal. Const., art. VI, § 13; *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [86 Cal.Rptr. 65, 468 P.2d 193]; 9 Witkin, California Procedure (4th ed. 1997) Appeal, § 349, p. 394), to avoid injustice, we have independently reviewed the claim.

hearing. However, if the notice is served by mail, the required 75-day period of notice shall be increased by five days if the place of address is within the State of California . . . ." We shall refer to this rule as the 75-day requirement.

Code of Civil Procedure section 437c, subdivision (f)(1) authorizes a party to move for summary adjudication of "one or more claims for damages" and such motions are subject to the same procedural requirements governing motions for summary judgment. (Code Civ. Proc., § 437c, subd. (f)(2).) North was therefore authorized to move for summary adjudication of Lackner's claim for punitive damages (*DeCastro West Chodorow & Burns, Inc. v. Superior Court* (1996) 47 Cal.App.4th 410, 421 [54 Cal.Rptr.2d 792]) and was subject to the 75-day notice requirement.

North's motion for joinder and summary adjudication is dated August 8, 2003. The record does not include proof of service. The hearing on the motion was originally set for September 19, 2003. However, on August 18th, Lackner moved to continue the hearing date to January 15, 2004, on the grounds she needed additional time to conduct discovery and prepare her opposition to North's motions. She did not identify North's motion as a ground for her request. The court granted her motion in part and continued the hearing to October 31, 2003. North filed his motion 84 days before this rescheduled hearing date. It was therefore timely, even if we allow an additional five days to account for service by mail. (Code Civ. Proc., § 437c, subd. (a).)

Nevertheless, Lackner contends, without citation of authority, that her motion to continue the hearing is separate from the 75-day requirement and therefore has no effect on the date the motion must be served. We disagree.

The purpose of the 75-day service requirement is to allow the parties time to prepare their opposition and replies and to prepare for the hearing. Prior to 2003, the time for serving notice of a motion for summary judgment was 28 days before the hearing on the motion. (Code Civ. Proc., § 437c, subd. (a); Stats. 1994, ch. 493, § 1, p. 2673.) In 2002, section 437c was amended by Senate Bill No. 688 (2001–2002 Reg. Sess.) to increase the time for service of notice to 75 days prior to the hearing. (Stats. 2002, ch. 448, § 5.)

The legislative history discloses that the purpose of this amendment was to provide the responding party with adequate time to conduct discovery that may be necessary to fully respond to the motion (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 688 (2001–2002 Reg. Sess.) as amended Aug. 26, 2002, p. 2) and to ensure that all evidence is before the court before it rules on the motion. (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 688 (2001–2002 Reg. Sess.) as amended Aug. 28, 2002, p. 4.)

■ Here, plaintiff, as the responding party, requested and was granted a continuance of the hearing date in order to complete discovery and prepare her opposition. This request clearly falls within the purpose of the 75-day requirement. We therefore conclude the notice requirement is measured from the date notice is served to the date of the actual hearing, and not the originally scheduled hearing.

This conclusion is consistent with cases applying a related time requirement. In addition to the 75-day requirement, subdivision (a) of section 437c also requires that the motion be heard 30 days before trial. In applying that requirement, the courts have held that they are satisfied if the hearing is held 30 days prior to the actual trial date rather than the originally scheduled trial date. (*Soderberg v. McKinney* (1996) 44 Cal.App.4th 1760, 1765, fn. 4 [52 Cal.Rptr.2d 635] [trial court may properly hear summary adjudication motion after first trial date where matter continued several times]; see also *Green v. Bristol Myers Co.* (1988) 206 Cal.App.3d 604, 608–609 [253 Cal.Rptr. 745].)

Because the effect of the continuance was to give Lackner at least 80 days to prepare her opposition, we are satisfied the 75-day rule was met. Nor does she claim she was prejudiced by North's late filing. (*Beroiz v. Wahl* (2000) 84 Cal.App.4th 485, 493, fn. 4 [100 Cal.Rptr.2d 905] [responding party must show prejudice from late service].) Although she raised the issue of timeliness in her opposition papers, she did not allege then that she was prejudiced by the late filing of the motion. Because it appears she fully responded to North's motion for summary adjudication of her punitive damages claim, we reject her claim of error.

### B. *North's Conduct Was Not Despicable*

Lackner contends the evidence raises a triable issue of fact as to whether North acted with malice or oppression under Civil Code section 3294 (hereafter section 3294). We disagree and conclude no reasonable juror could find his conduct was despicable. Lackner's claim for punitive damages fails as a matter of law.

In North's statement of undisputed facts he relied on three facts to support his motion for summary adjudication on the question of punitive damages: (1) North did not intentionally try to run into plaintiff, (2) North attempted to avoid the accident, and (3) North was in control as he descended the run. The undisputed evidence also establishes that just prior to the collision, North threw his snowboard in a very aggressive sideways turn in an effort to slow down as quickly as possible, but was unable to do so and collided with plaintiff.

Although Lackner disagrees with North's characterization of the evidence, she does not actually dispute these facts. In her supplemental separate

statement, she sets forth additional facts: (1) North traveled straight down the Cornice at an extreme rate of speed in a tuck position, (2) North looked several times during his descent to see whether his teammates were behind him, (3) North crashed directly into her, causing her severe injuries, (4) the collision occurred while Lackner and her husband were resting at the bottom of Cornice Bowl right above Hair Jump, an area used by many people to rest. On appeal, Lackner argues that these facts raise an inference that North's conduct prior to the time he saw her created a probability of danger, but he proceeded with his conduct nonetheless. We do not disagree with this statement. By itself, however, it is insufficient to show malice.

■ Section 3294, subdivision (a) authorizes an award of punitive damages in noncontract actions "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression . . . or malice . . . ."

Malice is defined as "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." (§ 3294, subd. (c)(1).) Oppression means "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." (*Id.*, subd. (c)(2).)[13]

The adjective "despicable" connotes conduct that is " '. . . so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon and despised by ordinary decent people.' " (*Mock v. Michigan Millers Mutual Ins. Co.* (1992) 4 Cal.App.4th 306, 331 [5 Cal.Rptr.2d 594], quoting BAJI No. 14.72.1 (1989 rev.); see *Cloud v. Casey* (1999) 76 Cal.App.4th 895, 912 [90 Cal.Rptr.2d 757].) " '[A] breach of a fiduciary duty alone without malice, fraud or oppression does not permit an award of punitive damages. [Citation.] The wrongdoer " 'must act with the intent to vex, injure, or annoy, or with a conscious disregard of the plaintiff's rights. [Citations.]' " Punitive damages are appropriate if the defendant's acts are reprehensible, fraudulent or in blatant violation of law or policy. The mere carelessness or ignorance of the defendant does not justify the imposition of punitive damages. . . . Punitive damages are proper only when the tortious conduct rises to levels of extreme indifference to the plaintiff's rights, a level which decent citizens should not have to tolerate.' " (*Tomaselli v. Transamerica Ins. Co.* (1994) 25 Cal.App.4th 1269, 1287 [31 Cal.Rptr.2d 433].)

The definition of malice has not always included the requirement of willful and despicable conduct. Prior to 1980, section 3294 did not define malice. It

---

[13] Because malice and oppression both require despicable conduct, in the interests of brevity, we shall limit our discussion to the concept of malice.

was construed to mean malice in fact, which could be proven directly or by implication (*Taylor v. Superior Court* (1979) 24 Cal.3d 890, 894 [157 Cal.Rptr. 693, 598 P.2d 854] (*Taylor*); 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 1335, p. 793) and could be established by conduct that was done only with "a conscious disregard of the safety of others . . . ." (*Taylor, supra,* at p. 895.) Relying on the reasoning in *G.D. Searle & Co. v. Superior Court* (1975) 49 Cal.App.3d 22 [122 Cal.Rptr. 218], the *Taylor* court recognized that recklessness alone is insufficient to sustain an award of punitive damages because " '[t]he central spirit of the exemplary damage statute, the demand for evil motive, is violated by an award founded upon recklessness alone.' " (24 Cal.3d at p. 895.) The court concluded that "[i]n order to justify an award of punitive damages on this basis, the plaintiff must establish that the defendant was aware of the probable dangerous consequences of his conduct, and that he willfully and deliberately failed to avoid those consequences." (*Id.* at pp. 895–896.) Applying that test, the Supreme Court directed the trial court to reinstate a claim for punitive damages where it was alleged the defendant was operating a motor vehicle while intoxicated, under circumstances which disclosed a conscious disregard of the probable dangerous consequences.[14]

In 1980, the Legislature amended section 3294 by adding the definition of malice stated in *Taylor, supra,* 24 Cal.3d 890. (Stats. 1980, ch. 1242, § 1, pp. 4217–4218; *College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 713 [34 Cal.Rptr.2d 898, 882 P.2d 894].) That definition was amended in 1987. As amended, malice, based upon a conscious disregard of the plaintiff's rights, requires proof that the defendant's conduct is "despicable" and "willful." (Stats. 1987, ch. 1498, § 5, p. 5780.) The statute's reference to "despicable conduct" represents "a new substantive limitation on punitive damage awards." (*College Hospital, Inc. v. Superior Court, supra,* 8 Cal.4th at p. 725.)

Additionally, the 1987 amendment increased the burden of proof. Malice or oppression must now be established "by clear and convincing evidence." (Stats. 1987, ch. 1498, § 5, p. 5780.) That standard "requires a finding of high probability. . . . ' "so clear as to leave no substantial doubt"; "sufficiently strong to command the unhesitating assent of every reasonable mind." ' [Citation.]" (*In re Angelia P.* (1981) 28 Cal.3d 908, 919 [171

---

[14] The circumstances alleged in *Taylor* were that a car driven by the defendant collided with plaintiff's car causing him serious injuries, that at the time of the collision, the defendant was drinking an alcoholic beverage and under its influence, he had been an alcoholic for a substantial period of time and was well aware of the serious nature of his alcoholism, he had a history and practice of driving a motor vehicle while under the influence of alcohol, he had previously caused a serious automobile accident while under the influence of alcohol, and had been convicted numerous times for driving under the influence of alcohol. (*Taylor, supra,* 24 Cal.3d at p. 893.)

Cal.Rptr. 637, 623 P.2d 198], superseded by statute on other grounds as stated in *In re Cody W.* (1994) 31 Cal.App.4th 221, 229 [36 Cal.Rptr.2d 848]; *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 891 [93 Cal.Rptr.2d 364].)

Because punitive damages are imposed "for the sake of example and by way of punishing the defendant" (§ 3294, subd. (a)), they are typically awarded for intentional torts such as assault and battery, false imprisonment, intentional infliction of emotional distress, defamation, nuisance intentionally maintained, fraud, trespass, conversion, civil rights violations, insurer's breach of covenant of good faith, wrongful termination and job discrimination, and products liability cases. (See cases collected in 6 Witkin, Summary of Cal. Law, *supra*, Torts, §§ 1349–1365, pp. 810–833.) In *Cloud v. Casey, supra*, 76 Cal.App.4th at page 912, an employment discrimination case, the court found that intentional discrimination, coupled with an attempt to hide the illegal reason for the discrimination with a false explanation, was despicable.

On the other hand, cases involving unintentional torts are far fewer and the courts have had to consider various factors in determining whether the defendant's conduct was despicable. Thus, punitive damage awards have been reversed where the defendant's conduct was merely in bad faith and overzealous (*Tomaselli v. Transamerica Ins. Co., supra*, 25 Cal.App.4th at p. 1288 [bad faith denial of an insurance claim]; *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc., supra*, 78 Cal.App.4th at p. 892 [same]), or the defendant took action to protect or minimize the injury to the plaintiff. (*American Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton* (2002) 96 Cal.App.4th 1017 [117 Cal.Rptr.2d 685] [breach of fiduciary duty where defendant attorney attempted to protect the plaintiff's interests after agreeing to appear as a deposition witness for another client over the objections of plaintiff, a prior and current client]; *Mayfield v. Johnson* (Miss. 1967) 202 So.2d 630 [automobile collision].)

Plaintiff has not cited any cases involving a collision where the court found the defendant's conduct was despicable, and we have found no California cases on point. While the court in *Taylor, supra*, 24 Cal.3d 890, held that punitive damages may be assessed where the defendant was driving under the influence of alcohol at the time of the collision, despicable conduct was not a requirement when *Taylor* was decided. Moreover, the circumstances alleged there were far worse than those shown here. (See fn. 14, *ante*.)

The circumstances in *Mayfield v. Johnson, supra*, 202 So.2d 630, are similar to those in the present case. There the plaintiff was denied the right to recover punitive damages for injuries sustained in an automobile collision. While on her way home, she pulled over to the right-hand side of the road at a four-way

intersection. While stopped, the defendant's car hit the back of the plaintiff's car. The defendant attempted to stop, but was unable to do so and skidded 81 feet before hitting the plaintiff's car. He admitted fault, explaining that he was not paying attention to his driving. The court found that although the defendant was speeding and not keeping a proper lookout, his effort to stop his car to avoid the collision indicated that his conduct was not willful, but rather an effort to prevent the injuries his negligence caused. (*Id.* at p. 631.)

Applying these criteria, we find the evidence is insufficient as a matter of law to show that North's conduct was despicable and that he acted with base or evil intent. It is undisputed that North did not intentionally hit Lackner and that when he saw her, he desperately attempted to avoid hitting her but lost control and was unable to do so. While North was traveling at a high rate of speed, Mammoth did not prohibit racing on an advanced run and no signs were posted warning skiers to slow down. Skiing conditions were very good at the time. The snow was good, the visibility was excellent, and the run was largely deserted. Given North's level of expertise and the conditions on the mountain, his speed alone was not despicable. While his decision to race through the rest area may have been reckless, as a practical or technical matter, he was not out of control until he saw Lackner and attempted to avoid hitting her. His error was in snowboarding at a high rate of speed without looking in the direction he was heading. However, when he did see her, he attempted to avoid hitting her, which is entirely inconsistent with evil or criminal intent.

In her complaint, Lackner alleges that North was using her and/or her husband as a slalom pole, intending to graze, nick, or narrowly avoid them at the last minute. If the evidence supported that view of the collision, our conclusion might be different. But that is a different case, which we need not decide. Had North intended to use Lackner as a slalom pole, he would have had her in his sights and, in light of his expertise, it is highly unlikely he would have hit her. At most, the evidence shows North was not watching out for skiers in front of him and that because he was caught up in the thrill of racing and out of his own exuberance, he may have acted with conscious disregard for the probable consequences of his conduct. Nevertheless, in light of the conditions on the hill, his overexuberance, and his effort to avoid the collision, his conduct cannot be considered despicable, nor do we find any evil intent. Accordingly, the trial court properly granted North's request for summary adjudication of Lackner's claim for punitive damages.

## DISPOSITION

The judgment in favor of Cassidy Bodine North on plaintiff's cause of action for negligence is reversed. The appeal from the judgment in favor of Oroville Union High School District is dismissed. In all other respects the judgments are affirmed. Lackner is awarded her costs to be paid by Cassidy Bodine North. (Cal. Rules of Court, rule 27(a)(1).) Defendants Mammoth Mountain Ski Area, Darryl Bender, and Chico Unified School District are awarded their costs on appeal. (*Ibid.*)

Sims, J., and Davis, J., concurred.